**Ethel TOLBERT, Administratrix of the Estate of Denver Tolbert, Appellant,**

v.

**UNION CARBIDE CORPORATION, a corporation, Appellee.**

**No. 73–1513.**

United States Court of Appeals, Fourth Circuit.

Submitted Dec. 4, 1973.

Decided April 3, 1974.

Rudolph L. Di Trapano, Charleston, W. Va., on brief for appellant.

W. T. O'Farrell and Jackson, Kelly, Holt & O'Farrell, Charleston, W. Va., on brief for appellee.

Before BRYAN, Senior Circuit Judge, and CRAVEN and WIDENER, Circuit Judges.

CRAVEN, Circuit Judge:

At age 52 and after almost 16 years' service with Union Carbide Corporation (the Company) at its Alloy, West Virginia, plant, Denver Tolbert was laid off

on August 5, 1962, due solely to a reduction in force. He had been paid for the one week of his remaining vacation time and had received two weekly payments under the Company's Layoff Allowance Plan when, on August 20, he was severely injured while repairing a barn roof. His injuries resulted in permanent and total disability. Subsequent to this injury Tolbert received two further weekly payments under the Layoff Allowance Plan, the final payment being made on September 6. On September 21 he was notified in writing to report back to work, but because of his injuries he was unable to do so.

At the time of Tolbert's layoff and injury, the Company was subject to the terms of a collective bargaining agreement (the agreement) with the Oil, Chemical and Atomic Workers International Union (the Union) which incorporated two types of disability benefits for employees of the Company. The first, known as a "Non-Occupational Disability Plan," was included in the company-union agreement as Appendix D and provided benefits to employees with at least one year of company service credit, but specifically excluded employees who had been laid off.[1] The second plan, entitled "Disability Benefit Prior to Age 65," was included in "The Pension Plan," a separate document incorporated by reference into the agreement and applicable only to employees with more than 15 years' company service credit. No provision of the Pension Plan dealt with the question of whether benefits would be available to employees who were laid off. No attempt was made under either plan to define "employee" or "termination of employment."

This action was instituted by Ethel Tolbert, administratrix of the estate of Denver Tolbert, to recover disability benefits under the second (the Pension Plan) provision. Jurisdiction was premised on diversity of citizenship, 28 U.S.C.A. § 1332, but we note that jurisdiction is also proper under Section 301(a) of the Labor-Management Relations Act, 29 U.S.C.A. § 185(a), since the benefits claimed arise out of a collective bargaining agreement between an employer and a labor organization. Because jurisdiction under Section 301(a) is proper, substantive federal law governs the rights of the parties. Textile Workers v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 923, 1 L.Ed.2d 972 (1957). Since neither party sought arbitration to determine the meaning of the agreement,[2] the

---

1. The section on "Conditions of Payment" under Appendix D provides:

   No payments under this plan will be made to employees who have been laid off, or who are on leave of absence.

2. A question, not addressed by counsel, arising from the "Pension, Insurance, Hospital-Surgical-Medical Plan Agreement" between Union Carbide and the Union is whether this dispute should have been submitted by the employee under grievance procedures set out in the principal collective bargaining contract. Part I, Section 3 of this agreement states:

   It is understood that if any dispute shall arise between the Company and any bargaining unit employee under the Pension Plan as to:
   (a) The calculation of his Company Service Credit;
   (b) The age of the employee;
   (c) His average straight-time monthly earnings; or
   (d) Whether an applicant, who shall have been determined to be totally and perma-

   nently disabled and who shall have at least fifteen (15) years of Company Service Credit but shall not have attained the age of sixty-five (65) years, shall have become totally and permanently disabled through any of the causes enumerated in Section II, Part B. Section 2 of the Pension Booklet; then such dispute may be taken up through the Grievance Procedure of the Principal Collective Bargaining Contract between the parties then in effect.

   As noted above, substantive federal law applies because the collective bargaining agreement is covered by § 301(a) of the Labor-Management Relations Act, 29 U.S.C.A. § 185(a). In Republic Steel Corp. v. Maddox, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965), the Supreme Court stated:

   As a general rule in cases to which federal law applies, federal labor policy requires that individual employees wishing to assert contract grievances must *attempt* use of the contract grievance procedure agreed upon by the employee and union as the mode of redress.

district judge, upon the motion for summary judgment, properly sought to interpret the agreement. Based on analogy to cases involving group insurance plans taken out by employers with insurance carriers and the interrelationship of various parts of the company-union agreement, the district judge granted the motion for summary judgment. We reverse.

■ Individual employees may bring suit under Section 301(a) of the Labor-Management Relations Act, 29 U.S.C.A. § 185(a), to vindicate rights arising from the collective bargaining agreement between their employer and union. Smith v. Evening News Ass'n, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962); Humphrey v. Moore, 375 U.S. 335, 84 S. Ct. 363, 11 L.Ed.2d 370 (1964). Unlike the cases cited by appellee, the contract from which the rights and duties of the parties arise is not subject to traditional rules of interpretation. The contract is not between employer and insurance carrier, but rather between employer and union. In Transportation-Communication Employees Union v. Union Pacific R. R. Co., 385 U.S. 157, 87 S.Ct. 369, 17 L.Ed.2d 264 (1966), the Supreme Court stated, "A collective bargaining agreement is not an ordinary contract for the purchase of goods and services, nor is it governed by the same old common-law concepts which control private contracts." 385 U.S. at 160–161, 87 S.Ct. at 371. And in United Steelworkers v. Warrior & Gulf Navigation Co., 363 U. S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), the court noted:

> It [the collective bargaining agreement] is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate . . . . The collective agreement covers the whole employment relationship. It calls into being a new common law—the common law of a particular industry or of a particular plant.

363 U.S. at 578–579, 980 S.Ct. at 1351. See Shulman, Reason, Contract, and Law in Labor Relations, 68 Harv.L.Rev. 999 (1955); Cox, Reflections Upon Labor Arbitration, 72 Harv.L.Rev. 1482 (1959). In view of these observations, we believe the district judge erred in restricting his interpretation of the pension plan and its disability provisions to the four corners of the agreement. The drafters of the pension plan simply did not consider this particular situation—whether an employee who is qualified for disability benefits under the pension plan due to his company service of more than 15 years can be denied disability benefits under the plan because at the time of his injury he was laid off.[3]

---

379 U.S. at 652, 85 S.Ct. at 616. There are two reasons, aside from the fact that the employer-union agreement involved here is not the "principal" collective bargaining agreement, that the "general rule" of the *Maddox* case should not apply. First, the question here—whether Tolbert was, in fact, an "employee" of the Company under the terms of the Pension Plan—is not one of the four types of disputes to be resolved by reference to the grievance procedure of the collective bargaining agreement. (*See* (a), (b), (c), and (d) of Part I, Section 3 set out above.) *Cf.* Smith v. Union Carbide Corp., 350 F.2d 258 (6th Cir. 1965), reversing, 231 F.Supp. 980 (E.D.Tenn.1964); Rhine v. Union Carbide Corp., 343 F.2d 12 (6th Cir. 1965), reversing, 221 F.Supp. 701 (W.D.Ky. 1964). Second, even if this dispute is covered by Part I, Section 3, the specific language of subsection (d) states only that "such dispute *may* be taken up through the Grievance Procedure . . . ." (Emphasis added.) This language, we believe, indicates an agreement between the parties that an individual "employee" can avoid the contract procedure and sue in the courts. *Cf. Maddox, supra,* 379 U.S. at 657–659, 85 S.Ct. 614.

While, in a suit to compel arbitration, the question of arbitrability considered above would be reserved in the first instance for decision by the arbitrator, subject to review by the courts, *see* United Steelworkers of America v. Enterprise Wheel and Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), there is here no attempt by the Company to compel arbitration. In these circumstances, we believe it unfair to the appellant for this court, *sua sponte*, to stay the action pending arbitration. Consequently, we proceed to the merits of the controversy.

3. While a number of cases deal with discharged employees' rights to pension benefits

The district court treats this issue in terms of whether or not the layoff of Tolbert constituted a "termination of employment." In concluding that such a termination took place on August 5, 1962, the court refers to two portions of the company-union agreement. First, it is argued that payment of a layoff allowance [4] to Tolbert negates any inference that the layoff was only a temporary suspension of work (and thus not a "termination") because of the specific language of the agreement that "a layoff allowance is payable to an employee . . . who is laid off on account of lack of work; unless the layoff is caused by a temporary suspension of work . . . ." This analysis is further bolstered, the district court reasons, by use of the word "reemployed" in referring to the seniority status of an employee who goes back to work after having been paid a layoff allowance. Second, the district court relies on the provision of the pension plan itself in determining when disability benefits are payable. Section 3 of Part B ("Disability Benefit Prior to Age 65") of the Pension Plan provides, in part:

> The Disability Benefit for an employee who qualifies under this Plan shall begin on the first day of the month immediately following the expiration of 26 consecutive weeks *after he ceased active employment as a result of such disability.*

(Emphasis added.) This provision, it is argued, evidences an intent that only those employees "actively employed" at the time of injury are entitled to the benefits of the Pension Plan's disability provisions as opposed to those who have been laid off.

While this language is clearly supportive of the district court's conclusion, it must be viewed in a larger context. The agreement contained two disability provisions—one which provided benefits to employees with a year or more company service but which specifically excluded employees who had been laid off, and a second plan (the Pension Plan) designed for employees with lengthy service to the company but with no provision corresponding to the first plan's provision which excluded laid-off workers. It seems a fair inference that, because of (1) a failure to specifically exclude laid-off employees from disability benefits under the Pension Plan where such exclusion was specified in the Non-Occupational Disability Plan, and (2) the agreement's obvious concern for the welfare of employees with lengthy company service, as evidenced by the adoption of the Pension Plan, the drafters of the agreement intended that disability benefits under the Pension Plan extend to laid-off employees. Certainly it cannot be argued that by paying a layoff allowance to an employee the company can escape payment of accrued pension benefits where the employee is laid off prior to reaching retirement age. Under the terms of the Pension Plan, pension benefits are clearly vested after ten years of company service. We believe the disability benefits of the Pension Plan are

---

where the plant at which they worked is permanently closed, Schneider v. Electric Auto-Lite Co., 456 F.2d 366 (6th Cir. 1972); Knoll v. Phoenix Steel Corp., 325 F.Supp. 666 (E.D.Pa.1971), aff'd 465 F.2d 1128 (3d Cir. 1972), cert. denied, 409 U.S. 1126, 93 S.Ct. 941, 35 L.Ed.2d 257 or where the company which employed them merged with another enterprise, Lucas v. Seagrave Corp., 277 F.Supp. 338 (D.Minn.1967), the precise problem raised by this case has apparently never been litigated.

4. Appendix C, "Layoff Allowance Plan," of the collective bargaining agreement provides:
   3. A layoff allowance is payable to an employee who has three (3) months or more company service credit and who is laid off on account of lack of work; unless the layoff is caused by a temporary suspension of work or the employee was hired for intermittent or casual work or as a temporary worker for a limited time or specified project.

   .     .     .     .     .
   .     .     .     .     .

   In case an employee is reemployed by the Company after he had been paid a layoff allowance, his company service credit for any subsequent layoff allowance consideration shall start from the date of such reemployment.

also vested where an employee has more than 15 years' company service credit and that such benefits are not dependent on his being actively employed at the time of injury.[5] That Tolbert qualified for the Layoff Allowance Plan benefits did not disqualify him for disability benefits. The two plans have entirely different purposes. That the payment of a layoff allowance is indicative of a termination of employment is inconsequential where the employee has the requisite number of years of company service to qualify him for the disability plan. Furthermore, we note that while a layoff allowance is not required, under the terms of the agreement, to be paid where "the layoff is caused by a temporary suspension of work," nothing in the plan prohibits payment of an allowance, even where the layoff is only temporary. The fact that Tolbert was called back to work less than seven weeks after being laid off, though hindsight, seems to indicate that the company's reduction in force was never considered permanent.

"Reemployed," as used in Appendix C ("The Layoff Allowance Plan"), is within a context totally different from the issue here under consideration; it relates only to computation of company service credit. Thus, an employee who is laid off is not entitled to count the period of time laid off as part of his company service credit for purposes of obtaining greater pension or disability benefits. But this provision has no bearing on who is entitled to get those benefits. The same is true of the provision in the Pension Plan that disability benefits begin 26 weeks after the employee "ceased active employment . . . ." We attribute no significance to this phrase since it evidences only the beginning point of payments in the typical situation—where the employee was injured while actively employed. The situation of Tolbert is one of those "unforeseeable contingencies" which a collective bargaining agreement could not be expected to anticipate and in which it would be error for a court, as in an ordinary contract dispute, "to make the words of the contract the exclusive source of rights and duties." United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 579, 80 S. Ct. 1347, 1351, 4 L.Ed.2d 1409 (1960), quoting Cox, Reflections Upon Labor Arbitration, 72 Harv.L.Rev. 1482, 1498–99 (1959). Based upon our view of the purpose behind the inclusion of the Pension Plan in the agreement—to give employees with lengthy company service

---

5. We do not suggest that disability benefits ordinarily vest. Indeed, vesting is probably the rare exception, as indicated by the disability compensation plans detailed in Appendix D and E of the collective bargaining agreement (Defendant's Exhibit I). Nothing in those plans suggests the vesting of benefits.

The Pension Plan, however, is a separate and distinct provision designed for employees with lengthy company service. By its terms, the Pension Plan unquestionably vests benefits in employees with the requisite amount of service, as Example 3 at page 11 of the Plan (Defendant's Exhibit II) makes clear. The Disability Benefit Plan, attached to and constituting Part B of the Pension Plan, restricts benefits to employees with 15 years or more of company service (10 years or more in order to obtain pension benefits). If vesting were not intended, it would have been a simple matter to draft this special plan in accordance with the other company disability plans (Appendix D and E) to avoid vesting.

If we treat the district court's conclusion that the layoff of Tolbert constituted a "termination of employment" as a finding of fact, it is entitled, of course, to the protection of the clearly erroneous rule. Assuming, without deciding, that Tolbert was in fact permanently terminated, we hold nevertheless that Tolbert was within the coverage of the Pension Plan because of vesting. But it is worth mentioning that Tolbert may have been an "employee" at all critical times and, as such, within the coverage of the plan. In Fishgold v. Sullivan Drydock and Repair Corp., 328 U.S. 275, 287, 66 S.Ct. 1105, 1112, 90 L.Ed. 1230 (1945), the Supreme Court said in a similar context:

A furlough is not considered a discharge. It is a form of lay-off. So is a leave of absence. And whether either results from unilateral action by the employer or otherwise, consequences are quite different from termination of the employment relationship. . . . An employee on furlough or on leave of absence has a continuing relationship with the employer; he retains a right to be restored to work under specified conditions.

greater security than those with less service—and the failure of the drafters to exclude laid-off workers from this plan where such exclusion was specified in the company's other disability plan, we find that Tolbert was entitled to benefits under the Pension Plan's disability provisions.

The decision of the district court is reversed, and the case is remanded to the district court with instructions to enter judgment and assess damages accordingly.

Reversed and remanded.

WIDENER, Circuit Judge (concurring):

I concur in the result.

The district court, in its written opinion, stated correctly the rule to be applied here, but failed to properly apply it:

"The general rule has been that a layoff amounts to termination where it is intended as a permanent dissolution of the employer-employee relationship. However, where a layoff is intended as mere temporary interruption from work, it does not constitute termination of employment."

Since the contract itself provides for layoffs and recalls by seniority, and retention of seniority during layoff status, in some instances for as much as two years, the employee was, in fact, recalled to his job, obviously under the terms of the contract; the disability plan itself contains no disqualification on account of layoff as it easily could have; and the employee had not accepted other work or indicated in any way his intention to sever the employment relationship with his employer; I think, at the time he suffered his disability, he was "an employee within the coverage of this plan" under the terms of the collective bargaining agreement, of which the plan must be considered a part. Thus, I would allow the employee to recover under ordinary principles of contract law and not be required to go beyond the

four corners of the contract and its included disability plan.

I do not consider that F.R.Civ.P. 52(a) concerning findings of fact has any application to this case, one way or the other. Had the district judge based a finding of permanent termination of employment on credible oral testimony, I probably would have voted to affirm. There was no factual finding by the district judge based on anything other than writings which are before us, and such parts of the opinion below as may allude to facts are in reality nothing more than the giving of emphasis to certain parts of the contract and recitals of admitted events.