SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY

v.

BROTHERHOOD OF RAILROAD SIGNALMEN, et al.

Appeal of BROTHERHOOD OF RAILWAY SIGNALMEN, et al.

No. 89–1174.

United States Court of Appeals, Third Circuit.

Argued April 18, 1989.

Decided Aug. 14, 1989.

---

Joseph Guerrieri, Jr., Samuel Issacharoff (argued), Maria Makris–Gouvas, and Michael G. Dzialo, Guerrieri, Edmond and James, Washington, D.C., Stephen C. Richman, Markowitz and Richman, Philadelphia, Pa., Lawrence Gold, AFL–CIO Legal Dept., and Allison Beck, Associate Gen. Counsel, Intern. Ass'n of Machinists and Aerospace Workers, Washington, D.C., for appellants.

Richard S. Meyer (argued) and Barbra Shotel, Dilworth, Paxson, Kalish and Kauffman, Philadelphia, Pa., for appellees.

Before SEITZ,[*] SLOVITER and GREENBERG, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Circuit Judge.

Appellants, the Brotherhood of Railroad Signalmen and several other unions (the "unions") representing employees of the Southeastern Pennsylvania Transportation Authority ("SEPTA") Regional Rail Division, appeal from the order of the district court granting SEPTA's motion for a preliminary injunction. The order enjoined the unions' membership from engaging in a sympathy strike with the International Association of Machinists and Aerospace Workers Union ("IAM" or the "Eastern employees") members who are striking against Eastern Airlines ("Eastern") and directed the parties to arbitration. The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337. This Court has jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

## BACKGROUND

SEPTA is divided into four divisions: the Regional Rail Division; the City Transit Division; the Red Arrow Division; and the Frontier Division. The Regional Rail Division, whose unions are the subject of the instant dispute, makes in excess of 90,000 passanger trips a day in the Counties of Philadelphia, Bucks, Chester, Delaware and Montgomery in Pennsylvania.

At midnight, on March 4, 1989, IAM began a strike against Eastern. The district court found, and it is not challenged, that IAM intends to engage in secondary picketing at SEPTA facilities.[1] We emphasize that SEPTA did not dispute at the preliminary hearing, and does not dispute on appeal, that IAM members have the right to engage in secondary picketing at SEPTA facilities. SEPTA, however, contests the rights of its union employees to honor any IAM secondary picket line.

The dispute between SEPTA and the unions emerges from the parties' understanding of their collective bargaining agreements, including certain "side agreements" and the bargaining process leading up to the signing of the collective bargaining agreements. SEPTA believes that, all things considered, the collective bargaining agreements are properly read to prohibit the unions from honoring any secondary picket lines set up by IAM members. Not surprisingly, the unions take the opposite position.

Each of the collective bargaining agreements between SEPTA and the unions contains an arbitration provision. Moreover, each of these agreements also contains a "no-strike" provision. The no-strike provision in the body of each of the collective bargaining agreements, except for the

---

[*] Since the date of oral argument, Judge Seitz has taken senior status.

1. Shortly after the strike against Eastern began, William Winpisinger, International President of the IAM, dispatched a telegram to the National Railway Labor Conference. This telegram provided: "In the Railroad Industry, we are presently contemplating establishing secondary picketing on Monday, March 6, 1989, as early in the morning as possible at selected locations on several rail carriers including ... SEPTA." This telegram also requested the assistance of other labor organizations and their membership by asking that the secondary picket lines not be crossed. In addition, Charles Hopkins, Jr., Chairman of the National Railway Labor Conference, by letter dated March 2, 1989, to "MEMBER ROADS and OTHER INTERESTED RAILROADS," stated that "secondary boycotts of railroads are likely."

agreement between SEPTA and the International Brotherhood of Electrical Workers Union ("IBEW"),[2] provides substantially as follows: with respect to any strike by the Union, the provisions of the Railway Labor Act shall apply. In addition, except for the IBEW agreement, each of the agreements has attached to it a "side letter" agreement, the validity of which is not challenged by the unions for the purposes of this appeal. These side letter agreements are all substantially the same. Each refers to the no-strike provision in the relevant collective bargaining agreement and prohibits the signatory union from engaging in any "sympathy strike ... in support of any job action or picketing by any SEPTA non-commuter rail employes."

The text of several of the side letter agreements states that the side letter agreements are subject to a "policy statement" of the signatory union. The Brotherhood of Railway Signalmen ("Signalmen") makes its side letter agreement subject to the following policy:

It is the policy of the Brotherhood of Railway Signalmen to support its members in declining to work when another railroad labor organization is on strike. When a strike exists a member should decline to work until pickets have been removed, and the strike is over. It is the further policy of the Brotherhood of Railway Signalmen that the right to decline to work during the strike of another railroad labor organization is a part of the rights of railroad employees guaranteed by the Constitution of the United States and the Railway Labor Act. The Brotherhood of Railway Signalmen will support its members in the free exercise of these rights.

The policy statement of the United Transportation Union ("UTU") provides that "[w]hen a strike of any other nationally recognized labor organization is in effect and danger to the safety of our members

exists in or about the area affected by the strike, and/or if there exists any substantial present or potential threat of danger to the members enroute to or from their work, and/or to the members' families, it is the policy of the United Transportation Union to support its members in declining to enter the territory directly affected." The policy statement of the Brotherhood of Locomotive Engineers provides that "[i]t is the policy of the B. of L.E. that it will support and, if necessary, place the full power of the B. of L.E., behind the members of the B. of L.E., who, because of fear of hazard or injuries to themselves or families or damage to their personal property decline to cross picket lines, and if such conditions do exist the management of the railroad so affected will be notified by the Local or General Chairman of the B. of L.E."

Based on the language of the collective bargaining agreements, the side-letter agreements, the policy statements, and additional testimony adduced at the preliminary hearing, the district court held that a "minor dispute," see 45 U.S.C. §§ 152, Sixth and § 153, First(i), existed between SEPTA and the unions as to whether the unions could engage in a sympathy strike with the Eastern employees. The district court found that (1) the IBEW has, without question, contractually agreed not to engage in any sympathy strike at any SEPTA operations; and (2) the other collective bargaining agreements "could clearly be determined at arbitration ... to prohibit the defendant unions from honoring with a sympathy strike secondary picketing by *any* unions and not just strikes by 'SEPTA non-commuter rail employees.'"

Having concluded that a minor dispute existed, the district court held that it had jurisdiction to enjoin the unions from striking while the minor dispute was being arbitrated in accordance with the procedures set forth in the Railway Labor Act

---

**2.** The collective bargaining agreement between SEPTA and the IBEW is different from the rest, providing in pertinent part: "For the duration of the Agreement, the Union, its officers, agents, representatives, and members shall not in any way directly or indirectly authorize, cause, assist, encourage, participate in, ratify or condone any strike, sit-down, sit-in, slow-down, [or] sympathy strike ... at any of SEPTA's operations or the operations of any customer of SEPTA." *See* footnote 5.

("RLA"). The district court then found that SEPTA, in addition to proving that a minor dispute existed, satisfied the other criteria for obtaining preliminary injunctive relief,[3] and enjoined the unions from violating the RLA by, *inter alia*, engaging in a sympathy strike. The district court also directed the "defendant and plaintiff [to] proceed to arbitration under their respective contracts and the RLA minor dispute resolution procedures to resolve their dispute concerning defendant unions' claimed right to honor the ... [IAM] picket lines." It is the issuance of this preliminary injunction which the unions appeal.

We must review the order of the district court and determine if the district court abused its discretion, committed an obvious error in applying the law, or made a serious mistake in considering the proof in issuing the preliminary injunction at issue. *United Telegraph Workers, AFL–CIO v. Western Union*, 771 F.2d 699, 703 (3d Cir. 1985). An "abuse of discretion is a clear error of judgment, and not simply a different result which can arguably be obtained when applying the law to the facts of the case." *Id.*

## II. DISCUSSION

The threshold question is whether the dispute between SEPTA and the unions can be termed a "minor dispute" as that phrase is used in the context of the RLA. 45 U.S.C. § 151 *et seq.* If we find that a minor dispute exists, we must then determine whether the preliminary injunction prohibiting the unions from going on strike was properly issued.

### A. *EXISTENCE OF A MINOR DISPUTE*

The RLA, and the concepts that are a part of it, "cannot be appreciated apart from the environment out of which it came and the purposes which it was designed to serve." *Elgin, J & E Ry. v. Burley*, 325 U.S. 711, 751, 65 S.Ct. 1282, 1303, 89 L.Ed. 1886 (1945) (Frankfurter, J., dissenting). "In adopting the ... [RLA], Congress en-

deavored to bring about stable relationships between labor and management in the most important national industry." *Brotherhood of Ry. Trainmen v. Chicago River & Ind. R.R.*, 353 U.S. 30, 40, 77 S.Ct. 635, 640, 1 L.Ed.2d 622 (1957). It was the goal of Congress to "prevent, if possible, wasteful strike[s] and [the] interruption of interstate commerce." *Burlington Northern R.R. v. Brotherhood of Maintenance of the Way Employees*, 481 U.S. 429, 107 S.Ct. 1841, 95 L.Ed.2d 381 (1987). To this end, Congress sought to exert as much "pressure toward amicable settlement between the parties" as possible. *Elgin, J & E Ry. v. Burley*, 325 U.S. at 754, 65 S.Ct. at 1304 (Frankfurter, J., dissenting).

The term "minor dispute," which had its genesis in *Elgin, J & E Ry. v. Burley*, 325 U.S. at 723, 65 S.Ct. at 1290, is predicated on § 2, Sixth and § 3, First(i) of the RLA. 45 U.S.C. §§ 152, Sixth and 153, First(i). These sections "set forth conference and compulsory arbitration procedures for a dispute arising or growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n*, — U.S. —, —, 109 S.Ct. 2477, 2480, 105 L.Ed.2d 250 (1989). A minor dispute

"contemplates the existence of a collective bargaining agreement already concluded or, at any rate, a situation in which no effort is being made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision [in a collective bargaining agreement] with reference to a specific situation or to an omitted case." *Id.*

While the definition of minor disputes has generally proven elusive, the Supreme Court in *Consolidated Rail* has done a great deal to remove the existing obscurity. The Supreme Court noted that the distinguishing feature of a minor dis-

---

**3.** There is no challenge on appeal to the district court's findings that the other criteria for grant-

ing a preliminary injunction were satisfied.

pute is that the "dispute may be conclusively resolved by interpreting the existing [collective bargaining] agreement." *Id.* While recognizing that this standard might allow a party to utilize the minor dispute resolution procedures by simply pleading that the dispute is resolvable by reference to an existing collective bargaining agreement, the Court noted that courts can exercise some judicial control over the label to be affixed to a dispute. The Court stated:

> "If the disputed action of one of the parties can 'arguably' be justified by the existing agreement or, in somewhat different statement, if the contention that the labor contract sanctions the disputed action is not 'obviously insubstantial', the controversy is a minor dispute within the exclusive province of the National Railroad Adjustment Board." *Id.* at ——, 109 S.Ct. at 2482 (quoting *Railway Labor Executives Ass'n v. Consolidated Rail Corp.*, 845 F.2d 1187, 1190 (3d Cir. 1988)).

The burden imposed upon the party asserting that a minor dispute is presented is a "light" one. *Consolidated Rail,* —— U.S. at ——, 109 S.Ct. at 2488.

The discrete question presently under consideration, therefore, is whether SEPTA met its light burden of showing that the no-strike provisions in the respective collective bargaining agreements, taken in conjunction with the side letter agreements, policy statements and any other evidence of the intent of the parties which may properly be considered, arguably prohibit the unions from engaging in a sympathy strike with the Eastern employees at this point. Before we proceed to the merits of this question, two preliminary matters must be addressed.

### 1. *Need for Clear and Unmistakable Proof*

█ First, unions argue that in order for the district court to have found the existence of a minor dispute, it must have found that the unions' collective bargaining agreements "clearly and unmistakably" evidenced that the unions waived their rights to engage in a sympathy strike with the Eastern employees. In support of this proposition the unions cite this Court's opinion in *Delaware Coca–Cola Bottling Co. v. General Teamster Local 326,* 624 F.2d 1182 (3d Cir.1980), and its progeny. *See Pacemaker Yacht Co. v. National Labor Relations Board,* 663 F.2d 455 (3d Cir.1981); *International Brotherhood of Electrical Workers, local 803, AFL–CIO v. National Labor Relations Board,* 826 F.2d 1283 (3d Cir.1987).

We cannot agree with the unions that to obtain injunctive relief SEPTA was required to prove before the district court that the unions in their collective bargaining agreements clearly and unmistakably waived their right to engage in sympathy strikes. Initially, it should be noted that each of the cases cited by the unions was decided under the National Labor Relations Act (NLRA) and not the RLA. Moreover, this Court has been unable to uncover a single case in the RLA context in which the standard employed was the "clear and unmistakable" criterion adopted by this Court for use under the NLRA. Indeed, not even the scholarly commentary that has discussed the relative merits of the "clear and unmistakable" standard has indicated that it has any relevance to RLA cases. *See, e.g.,* Note, *Coterminous Interpretation: Limiting Express No–Strike Clause,* 67 Va.L.Rev. 729 (1981); Note, *Express No–Strike Clauses And The Requirement Of Clear And Unmistakable Waiver: A Short Analysis,* 70 Cornell L.Rev. 272 (1985). This alone, however, would not be fatal to unions' contention because the Supreme Court has held that in proper circumstances the courts can borrow principles established under the NLRA for use in the RLA context. *See e.g. Trans World Airlines, Inc. v. Independent Federation of Flight Attendants,* —— U.S. ——, 109 S.Ct. 1225, 1230, 103 L.Ed.2d 456 (1989).

We find, however, that borrowing the "clear and unmistakable" standard from NLRA precedent is wholly inappropriate in the circumstance of the instant case. In *Consolidated Rail* the Supreme Court, as indicated above, stated that the appropriate standard for determining whether a minor dispute exists is whether the "disputed ac-

tion of one of the parties can arguably be justified by the existing agreement." *Consolidated Rail,* —— U.S. at ——, 109 S.Ct. at 2483. A requirement that SEPTA prove that the collective bargaining agreements clearly and unmistakably indicate that the unions waived their right to engage in a sympathy strike is fundamentally at odds with the standard set forth by the Supreme Court. As such, we conclude that SEPTA need only meet its relatively light burden of proving that the collective bargaining agreements can arguably be read to prohibit the unions from engaging in sympathy strike activity in order to categorize the instant dispute as a "minor" one within the parlance of the RLA.

### 2. *Use of Parol Evidence*

Second, unions contend that the district court erred in considering parol evidence and urge this Court not to consider such evidence in interpreting the agreements. Specifically, unions argue that the district court violated both general principles of contract interpretation and the parties so-called "zipper clause" in considering the extrinsic proof of intent proffered by SEPTA. We will take up these contentions in turn.

#### a. *Contract Interpretation*

■ We find that where a court is called on to interpret a collective bargaining‘ agreement it is generally appropriate for the court to look beyond the face of the collective bargaining agreement. The Supreme Court has declared as much in stating:

"A collective bargaining agreement is not an ordinary contract for the purchase of goods and services, nor is it governed by the same old common-law concepts which control such private contracts. It is a generalized code to govern a myriad of cases which the draftsman cannot wholly anticipate. The collective agreement covers the whole employment relationship. It calls into being a new common law—the common law of a particular industry. In order to interpret such an agreement it is necessary to consider the scope of other related collective bargaining agreements, as well as practice, usage and custom pertaining to all such agreements." *Transportation–Communication Employees Union v. Union Pacific R.R.,* 385 U.S. 157, 161, 87 S.Ct. 369, 371, 17 L.Ed.2d 264 (1966) (citations and internal quotations omitted).

Moreover, in *Consolidated Rail* the Supreme Court recently noted that collective bargaining agreements may include implied as well as express terms and that the parties' "practice, usage and custom is of significance in interpreting their agreement" to determine if one of the parties' position is arguably justified. *Consolidated Rail,* —— U.S. at ——, 109 S.Ct. at 2485. *See also,* R. Gorman, *Basic Text in Labor Law, Unionization and Collective Bargaining,* 541 (1976) ("It is common to treat the collective bargaining agreement as comprised not only of the written and executed document but also of plant customs and industrial practices as well as informal agreements and conversations made ar the bargaining table but not reduced to writing."). Finally, several courts of appeals have explicitly recognized that in the context of interpreting collective bargaining agreements it is appropriate to look to parol evidence.[4] *See, e.g., National Labor Relations Board v. L.B. Priester & Sons, Inc.,* 669 F.2d 355, 365 (5th Cir.1982); *International Ass'n of Machinists and Aerospace Workers, Lodge No. 1194 v. Sargent Indus.,* 522 F.2d 280, 282 (6th Cir, 1975);

---

**4.** While the cited cases were decided under the NLRA they are applicable for use in the RLA context. "The relationships created by a collective bargaining agreement [are to] be defined by application of an evolving federal common law grounded in national labor policy." *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 211, 105 S.Ct. 1904, 1911, 85 L.Ed.2d 206 (1985). As these concerns are common to labor law in general and are not peculiar to the RLA, principles developed in construing collective bargaining agreements in the NLRA context provide relevant and useful guidance. *See Trans Int'l Airlines, Inc. v. International Brotherhood of Teamsters,* 650 F.2d 949, 959 (9th Cir.1980), *cert. denied* 449 U.S. 1110, 101 S.Ct. 918, 66 L.Ed.2d 839 (1981).

*Tolbert v. Union Carbide Corp.,* 495 F.2d 719, 721 (4th Cir.1974).

■ Accordingly, we conclude that it was proper for the district court to use parol evidence in interpreting the collective bargaining agreements in question and such evidence is, therefore, properly considered by this Court. In so stating, we do not intend to imply that such evidence could be used to vary the terms of a collective bargaining agreement.

### b. Zipper Clauses

■ The unions also argue that the district court erred by ignoring the "contractual agreement of the parties to disregard parol evidence." The agreements between SEPTA and the unions contained what is known in labor law parlance as "zipper clauses." The zipper clauses in question specified that "[n]o agreement or understanding varying or altering the terms of this Agreement shall be of any validity unless in writing and signed by both the Union and SEPTA." Based on the above quoted language the unions claim that the district court was prohibited from examining parol evidence.

We cannot read the zipper clauses to prohibit the district court from examining parol evidence where the evidence is admitted in aid of understanding the intent of the parties in entering into the agreement or provision in question. Such an inquiry does not contradict the express prohibition of the zipper clause as the court is not "varying" or "altering" the terms of the parties' agreement but is simply interpreting the agreement. Thus, to the extent the district court heard parol evidence in order to discern the arguable intent of the no-strike provisions, the zipper clauses do not apply.

### 3. Does a Minor Dispute Exist?

■ We now determine whether the district court was correct in deciding that, based on all the relevant evidence, the collective bargaining agreements can be said arguably to prohibit the unions from engaging in a sympathy strike with the Eastern employees. The Supreme Court has explained that a party's position regarding the existence of a minor dispute can be said to be "arguably justified" if it is not "frivolous" or "obviously insubstantial." *Consolidated Rail,* — U.S. at —, 109 S.Ct. at 2488. We emphasize that the court's role is a limited one, as we examine the merits of this dispute only insofar as it is necessary to determine if SEPTA's position is arguably justified.

The unions, which, for the purposes of this subsection, shall exclude the IBEW,[5] contend that the district court erred in determining that the collective bargaining agreements, including the side letter agreements, can be read to prohibit the unions from engaging in a sympathy strike with Eastern employees. The unions contend that these side letter agreements, properly read, only prohibit the unions from engaging in sympathy strikes with other SEPTA non-commuter rail employees.

In rejecting this contention, the district court was particularly persuaded by and accepted the testimony of Mr. Hutchinson who is currently the chief officer of labor negotiations for SEPTA. Hutchinson negotiated the collective bargaining agreements with the unions in his capacity as the Chief Industrial Relations Officer of SEPTA. At the preliminary injunction hearing it was noted that the side letter agreements only prohibit the unions from engaging in "any sympathy strike ... in support of any job action or picketing by any SEPTA non-commuter rail employees." While acknowledging that the plain language of these side letters seems only to prohibit the un-

---

**5.** While the district court found that "there is no question that they [the IBEW] ... contractually agreed not to engage in any sympathy strike at any of SEPTA's operations," it, nevertheless, included the IBEW with the other unions in finding that a minor dispute existed between SEPTA and all the unions and directed all the parties to arbitration. The unions do not argue on appeal that the IBEW is differently situated based solely on the clarity of the particular language of the collective bargaining agreement between the IBEW and SEPTA. We, therefore, do not feel called upon to address such a question gratuitously.

ions from engaging in sympathy strikes for "SEPTA non-commuter rail employees," Hutchinson testified: "[T]hat's bad language ... I wrote it. In hindsight, I could have made it tighter, I'm sure. But it meant that they [the unions] would not honor any other picket line including picket lines of SEPTA employees unless they were one of the rail brotherhood of SEPTA." App. at 140. Hutchinson further testified that the no-strike provisions in the unions collective bargaining agreements, taking into account the side letter agreements, were intended to mirror the no-strike provisions of SEPTA's contract with its City Transit Division which clearly prohibits sympathy strikes such as the instant one. The district court stated that "it clearly flies in the face of common sense to conclude that SEPTA would choose to limit sympathy strikes only to situations involving its own noncommuter rail employees."

The unions contend that Hutchinson's statements are insufficient to create an arbitrable controversy. They argue that Hutchinson's testimony does not advance SEPTA's position because the IBEW collective bargaining agreement, negotiated by Hutchinson prior to the other collective bargaining agreements, did in fact mirror the City Transit Divisions broad no-strike provision while the other agreements did not. In this regard Hutchinson testified that while he had the IBEW collective bargaining agreement in hand and desired to have an equally broad no-strike provision in the remaining collective bargaining agreements, "the other ones [unions] said we will not put it in the contract [collective bargaining agreement], we'll put it in a side letter, an explanation of it." Thus, Hutchinson's testimony is that the body of the collective bargaining agreements taken together with the side-letter agreements was meant to have the same operative effect as the broad no-strike clause in the IBEW collective bargaining agreement.

In addressing the meaning of the side letter agreements to determine if SEPTA's position is arguably justified, this Court will also examine two of the policy statements to which side letter agreements were subject. The policy statement of the UTU provides that UTU members shall not be required to cross picket lines where a "strike of any other nationally recognized labor organization is in effect and danger to the safety of the union members exists in or about the area affected by the strike." The policy statement further provides that "SEPTA non-commuter rail employees are not members of 'any other nationally recognized labor organization.'" Similarly, the policy statement of the Signalmen provides that members of that union can refuse to cross a picket line where another "railroad labor organization" is on strike; SEPTA non-commuter rail employees were specifically designated as not being members of "railroad labor organizations."

These policy statements lend support to SEPTA's position in that it can be argued that they are only necessary if one views the side letter agreements as encompassing more than simply SEPTA non-commuter rail employees. If the side letter agreements are read as extending only to SEPTA non-commuter rail employees and we assume that, as the unions contend, the body of each collective bargaining agreement contains no limitation on the unions' right to engage in sympathy strikes, then the policy statements can be viewed as mere surplusage. It is not implausible to assert that it is only by reading the side-letter agreements as applying more broadly than to SEPTA non-commuter rail employees that these statements have any operative legal impact. Moreover, as SEPTA negotiated each of its sideletter agreements at the same time, employed essentially the same language in each, and for obvious reasons desired that each have the same legal effect, the understanding of the Signalmen and of the UTU, to the extent that it evidences the intent behind these provisions, can be said to have application to each of the unions.

In the end, the unions' arguments might carry the day in arbitration. Based on all of the evidence, however, we think that SEPTA's position is not so frivolous or insubstantial as to lack arguable justifica-

tion.[6]  We therefore hold that the district court did not abuse its discretion when it held that a minor dispute existed between SEPTA and the unions.[7]

## B.  *PROPRIETY OF ISSUING AN IN-JUNCTION*

The final issue to be addressed is whether, given the existence of a minor dispute, the district court abused its discretion in enjoining the unions from striking in sympathy with the Eastern employees.  The appropriate starting place for our analysis is with the Supreme Court's decision in *Brotherhood of R.R. Trainmen v. Chicago River & Ind. R.R.,* 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957).  In *Chicago River* the Brotherhood of Railway Signalmen filed 21 grievances with the National Railroad Adjustment Board, all of which were classified as minor disputes.  The Brotherhood, rather than await the decision of the arbitrators, decided to strike against the Railroad.  The Supreme Court, however, affirming the decision of the Seventh Circuit, held that an injunction could properly issue forbidding the Brotherhood from striking during the pendency of the arbitration.  The Supreme Court noted that a "District Court has jurisdiction and power to issue necessary injunctive orders to enforce compliance with the requirements of the Railway Labor Act notwithstanding the provisions of the Norris–LaGuardia Act."  *Id.* at 42, 77 S.Ct. at 641 (quoting *Brotherhood of R.R. Trainmen v. Howard,* 343

U.S. 768, 774, 72 S.Ct. 1022, 1025, 96 L.Ed. 1283 (1952)).  Only recently, the Supreme Court, citing *Chicago River,* declared that a "union may be enjoined from striking when the dispute concerns the interpretation or application of its contract and is therefore subject to compulsory arbitration."  *Pittsburgh & Lake Erie R.R. v. Railway Labor Executive Ass'n,* — U.S. —, —, 109 S.Ct. 2584, 2598, 105 L.Ed.2d 415 (1989).

Based on the holding of *Chicago River,* the district court determined that SEPTA was entitled to an injunction prohibiting the unions from striking pending resolution of the minor dispute by arbitration.  The unions advance two arguments before this Court in order to avoid the result seemingly dictated by *Chicago River* and reached by the district court.  We will address each argument.

### 1.  *Rights Emanating From The Eastern Employees Right To Engage In A Secondary Strike*

First, the unions contend that their right to engage in a sympathy strike emanates from the Eastern employees' rights to engage in a secondary strike of SEPTA.  The unions correctly note that the Supreme Court in *Burlington Northern R.R. v. Brotherhood of Maintenance of the Way Employees,* 481 U.S. 429, 107 S.Ct. 1841, held that the Railway Labor Act does not bar a union from engaging in secondary

---

**6.**  Because we have reached this conclusion, we need not consider SEPTA's alternate argument that the body of the collective bargaining agreements, in adopting the "substantial alignment" test, *see, e.g., Ashley Drew & Northern Ry. v. United Transport Union and its Affiliated Local No. 1121,* 625 F.2d 1357 (8th Cir.1980), should be read to prohibit the unions from engaging in a sympathy strike with the Eastern employees.  Without expressing any opinion as to the merits of SEPTA's position, we note that in 1987 the Supreme Court expressly rejected the substantial alignment test in *Burlington Northern R.R. v. Brotherhood of Maintenance of the Way Employees,* 481 U.S. 429, 107 S.Ct. 1841, 95 L.Ed.2d 381 (1987).

**7.**  Having determined that a minor dispute exists between SEPTA and the appellant unions, we conclude that the unions' position that the in-

stant dispute is neither major nor minor is without merit.  We point out that the cases cited by the appellant unions in support of their positions are wholly distinguishable.  *Pan American World Airways v. Flight Engineers Int'l Ass'n,* 306 F.2d 840 (2d Cir.1962); *Eastern Airlines, Inc. v. Flight Engineers Int'l Ass'n,* 340 F.2d 104 (5th Cir.), *cert. denied,* 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 59 (1965); *Burlington Northern Ry. v. Brotherhood of the Maintenance of the Way Employees,* 793 F.2d 795 (7th Cir.1986), *aff'd,* 481 U.S. 429, 107 S.Ct. 1841, 95 L.Ed.2d 381 (1987).  In none of those cases was the court called on to examine the terms of the collective bargaining agreements in order to assess the propriety of issuing an injunction prohibiting a strike.  This places the above cases in stark contrast to the instant case.  *See Long Island R.R. v. Int'l Ass'n of Machinists and Aerospace Workers,* 874 F.2d 901, 908 (2d Cir.1989).

activity after the major dispute resolution procedures of the RLA have been exhausted. *Id.* 107 S.Ct. at 1852–54. The unions, using the Supreme Court's holding in *Burlington Northern* as a springboard, assert that the right of the Eastern employees to strike is an empty one without the corresponding right on the part of the unions to honor the Eastern employees' picket lines. Thus, the unions conclude, the right of the Eastern employees to engage in secondary picketing at SEPTA facilities necessarily engenders a right on the part of the unions to honor the picket lines.

The impact of any secondary activity into which the Eastern employees might enter will, of course, be diminished if the members of the unions cannot honor those picket lines. Indeed, it is even likely that the Eastern employees will be discouraged from engaging in any secondary activity at SEPTA facilities. Secondary picketing by Eastern employees at SEPTA facilities might not only place the unions' membership in the uncomfortable position of having to cross a picket line but might actually encourage the unions' members to violate the court's order enjoining them from taking any such action.[8]

The unions' position is analytically flawed. It must be remembered that the rights which this Court is called on to determine are those of the unions and not those of the Eastern unions. The rights of the unions are determined by their respective collective bargaining agreements and must be resolved in accordance with the procedures outlined in the RLA. This requires that the unions submit their dispute with SEPTA to binding arbitration. *See* 45 U.S.C. § 153. Moreover, having found that a minor dispute exists, the courts' have the authority under *Chicago River* to maintain the integrity of the arbitration process by enjoining the unions from striking prior to the completion of the arbitration proceedings.

The unions argue that *Burlington Northern* undermines the above analysis. In *Burlington Northern* the Supreme Court recognized that after the expiration of the "virtually endless" major dispute resolution procedures, unions are entitled to engage in broad economic self help including secondary picketing against employers even if they are not substantially aligned with their own. *Burlington Northern R.R. v. Brotherhood of Maintenance of the Way Employees*, 481 U.S. at 452–53, 107 S.Ct. at 1854–55. The unions contend that the Supreme Court's opinion suggests that in all cases employees of struck secondary employers must be permitted to honor secondary strikes notwithstanding prohibitions against such activity in their own collective bargaining agreements.

We do not agree with the unions. Such a holding would negate provisions in collective bargaining agreements that clearly prohibited employees from engaging in sympathy strikes and would in cases such as the instant one, where a minor dispute is present, do violence to the minor dispute resolution mechanism of the RLA and the Supreme Court's decision in *Chicago River*.[9] We cannot attribute such an anomalous result as being within the dictates of the Supreme Court's decision in *Burlington Northern*. The recognition that employees have broad rights to engage in secondary activity and the corollary that workers may honor these pickets is not inconsistent with requiring those workers to be bound by other contrary legal obligations that they have undertaken. *See*

---

**8.** It was represented to this Court at oral argument that IAM has not struck SEPTA facilities to this point for fear of encouraging action on the part of the unions which would violate the injunction of the district court.

**9.** The Supreme Court in *Burlington Northern*, after citing *Chicago River*, expressly recognized that *Burlington Northern* was "not a case in which the scheme of the RLA could not begin to work without judicial involvement." This dis-

tinguishes *Chicago River*, and the instant case, from *Burlington Northern*. Indeed, recently the Supreme Court flatly recognized that "[c]ourts may enjoin strikes arising out of minor disputes," *Consolidated Rail Corp. v. Railway Labor Executives Ass'n*, —— U.S. at ——, 109 S.Ct. at 2481, without noting any possibility of an exception where such an injunction might dilute another unions right to engage in secondary activity.

*Long Island R.R. v. International Ass'n of Machinists and Aerospace Workers,* 874 F.2d at 910 n. 4 (noting that strikers seeking to engage in secondary picketing could enlist the support of unions not subject to the RLA or individual employees not acting in concert.).

■ In fact the Supreme Court impliedly recognized the validity of this principle in an opinion subsequent to *Burlington Northern. Trans World Airlines, Inc. v. Independent Federation of Flight Attendants,* —— U.S. ——, 109 S.Ct. 1225, 103 L.Ed.2d 456 (1989). In *Trans World Airlines* the Court stated: "parties who have unsuccessfully exhausted the Railway Labor Act procedures for resolution of a major dispute may employ the full range of whatever peaceful economic power they can muster, *so long as its use conflicts with no other obligation imposed by federal law.*" *Id.* 109 S.Ct. at 1233 (emphasis added) (quoting *Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.,* 394 U.S., 369, 391–92, 89 S.Ct. 1109, 1122–23, 22 L.Ed.2d 344 (1969)). Thus, to the extent that the Eastern employees right to engage in secondary activity can be said to bestow any right on the part of the unions to honor the strike, these rights are nevertheless subject to the obligations imposed on them by the RLA. Accordingly, we conclude that the right of the Eastern employees to engage in secondary picketing at SEPTA facilities does not necessarily engender a corresponding right on the part of the unions to honor the picket lines at this stage.

### 2. *Applicability of Buffalo Forge*

Finally, the unions argue that "the district court committed clear legal error by completely disregarding *Buffalo Forge [Co. v. United Steelworkers of America,*

*AFL–CIO,* 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976)], as a case arising under the NLRA and concluding that it was therefore without applicability under the RLA." SEPTA contends that the district court was correct in finding *Buffalo Forge* inapplicable. A brief discussion of *Buffalo Forge* is required in order to understand the positions of the parties.

In *Buffalo Forge* production and maintenance employees of the Buffalo Forge Company, represented by the United Steelworkers of America (the union), sought to engage in a sympathy strike with the office clerical-technical employees of Buffalo Forge. The union contended that such a sympathy strike was not in violation of the no-strike provision in their collective bargaining agreement. Buffalo Forge argued that the sympathy strike would violate the parties' collective bargaining agreement. It was uncontested that disputes regarding the breadth of the no-strike clause were within the ambit of the arbitration clause in the parties' collective bargaining agreement.

On these facts, the Supreme Court held that the district court lacked jurisdiction to issue an injunction against the union's sympathy strike. *Id.* at 404, 96 S.Ct. at 3146. The Court determined that the Norris–LaGuardia Act's prohibition against the issuance of labor-dispute injunctions, *see* 29 U.S.C. § 104,[10] should control notwithstanding § 301(a) of the Labor Management Relations Act, which granted district courts jurisdiction over suits for violations of contracts between employers and labor organizations.[11]

The stated basis for the Court's decision was the Court's fear that affording the district courts jurisdiction to grant injunctions in these types of cases would thrust the courts headlong into the business of interpreting collective bargaining agree-

---

**10.** Section 104 provides in pertinent part: "No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute."

**11.** The Labor management Relations Act, enacted in 1947, amended the NLRA. *See* 61 Stat. 139, 29 U.S.C. § 151 *et seq.* Section 301(a) of the LMRA provides: "Suits for violation of con-

tracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court in the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."

ments thereby unduly influencing the ultimate decisions of the arbitrators. *Id.* at 412, 96 S.Ct. at 3149. Such a result, the Court believed, would conflict with the federal policy of favoring dispute resolution via arbitration. *Id.* at 411, 96 S.Ct. at 3149. *See* Note, *The Applicability of Boys Markets Injunctions To Refusals To Cross A Picket Line,* 76 Colum.L.Rev. 113, 115 (1976). The unstated basis for the Court's decision was probably the Court's fear that "a contrary result would lead to fewer arbitration clauses in collective bargaining agreements, the unions being less willing to agree to arbitrate disputes or to proceed to arbitration following a preliminary injunction." *Trans Int'l Airlines v. International Brotherhood of Teamsters,* 650 F.2d 949, 966 (9th Cir.1980).

■ The discrete question before this Court is whether *Buffalo Forge* should be applied by analogy from the NLRA context to the instant dispute under the RLA. We must approach this problem carefully, keeping in mind the Supreme Court's admonition not to import the NLRA "wholesale into the railway labor area." *Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.,* 394 U.S. at 383, 89 S.Ct. at 1118. Thus, "even rough analogies must be drawn circumspectly, with due regard for the many differences between the statutory schemes." *Id. See Trans World Airlines v. Independent Federation of Flight Attendants,* 109 S.Ct. at 1230.

We find the considerations underlying *Buffalo Forge* inapplicable to the RLA and therefore conclude that the district court did not err in refusing to apply *Buffalo Forge* to this case. In a dispute under the RLA, as described earlier, the court is called on only to determine if the party seeking the court's intervention has put forth an arguably justified position. In making this limited evaluation of the merits of the dispute, the court is in no way usurping the arbitrator's function nor unfairly predisposing the arbitrator toward the very tentative decision made by the district court. Thus, the stated basis for

*Buffalo Forge* is not present. Moreover, the unarticulated basis for *Buffalo Forge,* fear that parties will not agree to arbitrate their disputes, is utterly irrelevant in the context of the RLA which requires parties to submit their minor disputes to binding arbitration. Finally, and perhaps most importantly, the RLA, unlike the NLRA, was enacted for the purpose of preserving industrial peace by avoiding strikes over minor disputes. *See Burlington Northern R.R. v. Brotherhood of Maintenance of the Way Employees,* 481 U.S. at 444–45, 107 S.Ct. at 1875–76. This Court should, therefore, not import principles established in the NLRA context into RLA cases when such action would have the effect of hindering the attainment of the underlying remedial goals of the RLA. *See Trans Int'l Airlines Inc. v. International Brotherhood of Teamsters,* 650 F.2d at 966.

Accordingly we conclude that the district court properly held that *Buffalo Forge* should not be applied to the instant case. We note that this conclusion is in accord with the result reached by the only other two courts of appeals to have faced the question. *Long Island R.R. v. International Ass'n of Machinists and Aerospace Workers,* 874 F.2d at 909; *Trans Int'l Airlines Inc. v. International Brotherhood of Teamsters,* 650 F.2d at 969.

## III.  CONCLUSION

For all the foregoing reasons, we will affirm the order of the district court granting SEPTA a preliminary injunction.