UNITED TRANSPORTATION UNION, Appellant,

v.

CONEMAUGH & BLACK LICK RAILROAD COMPANY, Appellee.

No. 89–3381.

United States Court of Appeals, Third Circuit.

Argued Oct. 24, 1989.

Decided Jan. 23, 1990.

Clinton J. Miller, III (argued), Asst. Gen. Counsel, United Transp. Union, Cleveland, Ohio, for appellant.

Alan D. Berkowitz (argued) and Mary Minehan McKenzie, Dechert, Price and Rhoads, Philadelphia, Pa., for appellee.

Before HUTCHINSON, NYGAARD and WEIS, Circuit Judges.

OPINION OF THE COURT

HUTCHINSON, Circuit Judge.

I.

Appellant, the United Transportation Union (Transportation Union), appeals an order of the United States District Court for

the Western District of Pennsylvania granting appellee, Conemaugh & Black Lick Railroad Company (the Railroad or C & BL), summary judgment in the Transportation Union's action to restrain the Railroad from unilaterally reducing the size of its operating crews from three to two employees.

The Transportation Union filed this action in the district court under the Railway Labor Act (RLA or the Act), 45 U.S.C.A. §§ 151–188 (West 1986), alleging that the Railroad's unilateral reduction in crew size violated the status quo provision of the RLA, which prohibits the alteration of "rates of pay, rules, or working conditions" pending exhaustion of the negotiation and mediation procedures required by the Act. *See* 45 U.S.C.A. § 156. In its motion for summary judgment, the Railroad claimed that the parties had exhausted the RLA procedures without reaching an agreement before it implemented the crew size reduction and therefore it did not violate the Act's status quo provision. The Transportation Union filed a cross motion for summary judgment claiming that the parties had negotiated an agreement on crew size in a "Supplemental Settlement Agreement," and thus the Railroad unlawfully changed the status quo when it unilaterally implemented the reduction in crew size.

In its appeal, the Transportation Union does not clearly separate three closely related, but analytically distinct, arguments on the controlling status quo issue. The first, which we will call the waiver argument, was made and rejected in the district court. The waiver argument's hypothesis is that a party who agrees to anything after the Act's procedures have been exhausted waives that party's right to self-help and so revives the status quo. The Transportation Union appears to have abandoned this argument on appeal, per-

haps wisely.[1] Accordingly, we will not directly consider the waiver argument.

The second argument, which the Transportation Union does press on appeal, is that the Supplemental Settlement Agreement these parties made to continue negotiations after the Act's procedures were exhausted implies an agreement to continue the status quo with respect to crew size. We will call this the implied agreement argument. The district court rejected this argument, which would have the same effect as the abandoned waiver argument. For the reasons set out below, we also reject the Transportation Union's implied agreement argument.

Finally, the Transportation Union presses an argument, ostensibly distinct from the second, that the express reference in the Supplemental Settlement Agreement to continued negotiation on crew size, read together with Rule Twenty–Four of the new master agreement incorporating local rules, necessarily provides for continuation of former Local Rule Five, which set the Railroad's crew size at three. We will call this the textual argument. The textual argument has an especially strong tendency to blur at one end into the implied agreement argument, as the implied agreement argument blurs into the logical flow of the waiver argument at the other end. It is not clear to us that the textual argument was precisely raised in the district court. We have, nevertheless, considered and rejected it. Accordingly, for the reasons set forth more fully below, we will affirm the district court's order granting the Railroad's motion for summary judgment and dismissing the Transportation Union's action to restrain the Railroad from exercising self-help in unilaterally reducing the size of its operating crews.

---

1. As the district court reasoned, the Transportation Union's waiver argument runs counter to the case law. *See, e.g., United Steelworkers of Am. v. National Labor Relations Bd.,* 536 F.2d 550, 555 (3d Cir.1976) (holding an agreement waiving a statutory right must be clear and unmistakable). The waiver argument also seems unsound for policy reasons. It would be likely to deter the parties from continuing dis-

cussions after the Act's mediation procedures were exhausted. This would encourage resort to economic force—self-help by the railroad, strike by the union—contrary to the Act's main purpose of peaceful settlement. *See Detroit & T. Shore Line R.R. v. United Transp. Union,* 396 U.S. 142, 149–50, 90 S.Ct. 294, 298–99, 24 L.Ed.2d 325 (1969).

## II.

The Transportation Union currently represents the operating employees at the Railroad. Its status as their bargaining agent is recent and was attained well after May, 1986, when the Act's procedures for settlement of disputes were invoked in this case. The operating employees include engineers, conductors and brakemen. The Railroad is a wholly owned subsidiary, sometimes called a captive railroad, of Bethlehem Steel Corporation (Bethlehem Steel). Before May, 1987, the United Steelworkers of America (the Steelworkers) and the United Steelworkers of America Local 3176 (Steelworkers Local 3176) had captured the loyalty of the Railroad's operating employees and represented them for bargaining purposes. In the course of this dispute, the Steelworkers lost that loyalty. The Transportation Union was certified as the representative after a secret ballot election, allowing it to succeed the Steelworkers as the bargaining representative for the Railroad's operating employees.

Before this dispute arose, the Railroad, along with the other five captive railroads of Bethlehem Steel, had successfully negotiated a series of collective bargaining agreements with the Steelworkers. In negotiations, the practice of the Railroads and the Steelworkers had been to first negotiate a master agreement containing the terms and conditions of employment applicable to all of Bethlehem Steel's captive railroads, and thereafter to seek local agreements containing the terms and conditions of employment particularly applicable to the individual captive railroads.

In May, 1986, a master agreement was in effect between the captive railroads and the Steelworkers, in addition to a local agreement between the Railroad and Steelworkers Local 3176. The master agreement covered employees at Bethlehem Steel's six captive railroads. They were organized into bargaining units represented by eight separate Steelworkers locals. The master agreement provided for incorporation of the terms of these local agreements. *See* Joint Appendix (J.A.) at 194. The old master agreement was due to ex-

pire on August 1, 1986. On May 30, 1986, Bethlehem Steel's captive railroads received a written notice from the Steelworkers, conforming with § 6 of the Act, 45 U.S.C.A. § 156, expressing the union's desire to negotiate the terms and conditions of a new collective bargaining agreement. On June 4, 1986, the captive railroads themselves served written notice on the Steelworkers expressing their wish to negotiate a new master collective bargaining agreement.

Although the Railroad and the Steelworkers shared a consensus that a new agreement was needed, that consensus did not extend to its terms. This lack of consensus on terms was demonstrated at the outset. *See* J.A. at 109. The Railroad, in its June 6, 1986, notice to Steelworkers Local 3176, included a proposal to change existing C & BL Local Rule Five, which governed the size of operating crews. Under Local Rule Five, a crew consisted of three employees: an engineer, a conductor and a brakeman. The Railroad proposed changing Local Rule Five to give it the right to set crew size. *See* J.A. at 113.

From June through mid-September of 1986, negotiations proceeded in an effort to resolve differences over the terms of the master agreement and the captive railroads' local agreements. Crew size reduction at C & BL was discussed at both levels, but the parties did not reach any agreement. On September 19, 1986, all of Bethlehem Steel's captive railroads informed the Steelworkers by letter that they would implement their proposals unilaterally unless the Steelworkers invoked mediation. On September 22, 1986, the Steelworkers sent a letter to the National Mediation Board (Mediation Board) asking it to mediate all the differences.

The Mediation Board did hold mediation sessions in November, 1986. There was, however, no mediation on the continuation of Local Rule Five setting the crew size. Instead, the railroads and the Steelworkers agreed that resolution of this issue, which affected only a single bargaining unit at a single railroad, should not impede negotiation of a master agreement covering all

bargaining units at all of the railroads. Accordingly, they decided to defer the crew size issue for later bargaining between C & BL and Steelworkers Local 3176.

In negotiating sessions on the master agreement held in January, 1987, the subsidiary railroads and the Steelworkers did reach a new master agreement to be effective March 1, 1987. This new master agreement was formalized by a "Settlement Agreement." In March, 1987, the Steelworkers notified the Mediation Board that agreement had been reached on the contract, and the Mediation Board later closed its file on this matter.[2]

C & BL and Steelworkers Local 3176 also signed a Supplemental Settlement Agreement dated March 1, 1987. That agreement stated their pledge to continue to negotiate over the crew size issue for an additional ninety days, see J.A. at 253, and contained two other specific provisions. One concerned a pension sweetener which was part of the new master agreement. The master agreement contained a "sweetheart" pension benefit that gave eligible employees until May 31, 1987, to retire and elect enhanced pension benefits. In the Supplemental Settlement Agreement, the Railroad and Steelworkers Local 3176 agreed that this "window period" for electing the enhanced pension benefits would be extended ninety days.[3] The deferral allowed the Railroad's employees to await the outcome of the negotiations on the crew size issue, which might lead to additional pension and severance enhancements, before having to decide whether to retire.

Finally, the Supplemental Settlement Agreement also stated that the "no contracting out" provision in the new master agreement would be suspended at the Railroad if no agreement on crew size was reached within the extended ninety-day period. Under the "no contracting out" provision, Bethlehem Steel had pledged that work currently being performed by the captive railroads' operating employees would continue to be performed by them and outsiders would not be used. However, if the parties failed to agree on crew size, the Supplemental Settlement Agreement provided that the railroads could suspend this provision and C & BL would be free to assign work to outsiders, leaving the operating employees in Steelworkers Local 3176 without work. Thus, during the ninety-day period following March 1, 1987, the date of the Supplemental Settlement Agreement, the Railroad would remain bound by the master agreement's provision prohibiting contracting out; but thereafter, that is, after May 30, 1987, the Railroad would be free to contract out so long as the crew size issue remained open. The Supplemental Settlement Agreement had no other express terms.

The Railroad and Steelworkers Local 3176 continued to bargain on the crew size issue during the additional ninety-day period. The Railroad offered Steelworkers Local 3176 a revised incentive plan in exchange for crew size reduction. Dissatisfied, the local's members rejected the Railroad's proposal and sought a new bargaining agent. On May 15, 1987, the Transportation Union was certified as the new bargaining agent for the former mem-

---

2. The notice to the Mediation Board that an agreement had been reached ignored the fact that the Steelworkers and the railroads had not reached agreement on the crew size issue. Nevertheless, the district court held that the parties had exhausted the Act's procedures, and neither the Transportation Union nor the Railroad question this holding on appeal. Accordingly, we too will accept it and assume that the parties had either exhausted the Act's mediation procedures or decided to have no further resort to them on the crew size issue. Since the Steelworkers were the exclusive bargaining agent for C & BL's operating employees when this decision to end mediation was made, the decision is

binding on the employees they then represented. It would seem to equally bind the Steelworkers' successor as bargaining agent, the Transportation Union.

3. Absent resolution of the crew size issue, the agreement could be read as giving the affected employees only one day after the May 30, 1987 end of the extended negotiating period to make their election, or perhaps until the expiration of the additional ninety days subsequent to May 31, 1987. The agreement is unclear on this point, but we need not resolve it for the purposes of this opinion.

bers of Steelworkers Local 3176. On June 1, 1987, the Railroad reduced the crew size from three to two workers.

### III.

Pursuant to 28 U.S.C.A. § 1331 (West Supp.1989), the federal courts have federal question subject matter jurisdiction over this action arising under the RLA. This Court has appellate jurisdiction under 28 U.S.C.A. § 1291 (West Supp.1989) over the final judgment of the district court granting the Railroad summary judgment.

Our scope of review is plenary. In the summary judgment context, this means that we apply "the same test the district court should have utilized initially." *See Erie Telecommunications v. City of Erie*, 853 F.2d 1084, 1093 (3d Cir.1988) (quoting *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977)). To obtain summary judgment, the moving party must "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When the moving party makes a case for summary judgment, the party opposing the motion has an affirmative duty to "set forth specific facts showing there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "If the evidence [submitted by the opposing party] is merely colorable or is not significantly probative summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citations omitted).

### IV.

Disputes in the railroad industry between management and labor fall into two classes. They are either "major" or "minor" disputes. The Act provides different procedures for resolving them. These procedures complement each other and their use is central to the Act's purpose of bringing industrial harmony to the railroad industry. A major dispute is a dispute over proposals to change rates of pay, rules or working conditions. A minor dispute is a dispute over the interpretation or application of existing collective bargaining agreements. *See Pittsburgh & L. E. R.R. v. Railway Labor Executives' Ass'n*, — U.S. —, 109 S.Ct. 2584, 2589 n. 4, 105 L.Ed.2d 415 (1989). In other words, a major dispute concerns the terms an agreement should contain. It involves problems that arise around the bargaining table in the negotiation of an agreement. A minor dispute concerns the meaning and application of the provisions of the negotiated agreement that has been hammered out at the bargaining table. Minor disputes include disputes about the existence or extent of provisions established or implied into the agreement by usage, practice or custom.

When a dispute is classified as major, the parties must exhaust the negotiation and mediation procedures required under the Act. Until these time-consuming procedures are exhausted, no change in the existing agreement or the practices that have grown up under it—rates of pay, rules or working conditions—can be lawfully made by either the railroad or the union.[4] *See* 45 U.S.C.A. § 156. A railroad's

---

**4.** In *Detroit & T. Shore Line R.R. v. United Transp. Union*, the Supreme Court held that the "working conditions" which cannot be changed under the status quo provision of the Act include "those actual, objective working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose and which are involved in or related to that dispute." 396 U.S. 142, 153, 90 S.Ct. 294, 301, 24 L.Ed.2d 325 (1969). Recently, however, the Supreme Court has noted that its conclusion in *Shore Line* "extended the relevant language of § 156 to its outer limit." *Pittsburgh & L.E.R.R. v. Railway Labor Executives' Ass'n*, — U.S. —, 109 S.Ct. 2584, 2594, 105 L.Ed.2d 415 (1989). In this case, the Transportation Union conceded at oral argument that the status quo at issue in this case is Local Rule Five, which sets the crew size at three, and not the objective working conditions broadly conceived. This concession seems compelled by the district court's unchallenged holding that RLA procedures had been exhausted when the Settlement Agreement was signed. It is also consistent with the Transportation Union's argument that the Supplemental Settlement Agreement carried with it old Local Rule Five, creating anew the three man status quo and requiring fresh resort to the Act's lengthy mediation process starting

attempts to unlawfully change conditions by unilateral action or a union's strike to force changes can be enjoined by a district court. *See United Transp. Union v. Penn Cent. Transp. Co.,* 505 F.2d 542, 543 (3d Cir.1974) (per curiam). However, after the RLA procedures are exhausted, the parties are free to engage in self-help; the railroad can unilaterally effect changes, the union can strike and economic strength becomes again the ultimate arbiter of a major dispute. *See Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 378–79, 89 S.Ct. 1109, 1115–16, 22 L.Ed.2d 344 (1969); *Brotherhood of Ry. & S.S. Clerks v. Florida E.C. Ry.,* 384 U.S. 238, 244, 86 S.Ct. 1420, 1423, 16 L.Ed.2d 501 (1966). However, if the dispute is classified as a minor dispute, labor relations' version of the rule of law, mandatory arbitration, comes into play. In the present case, the district court held the crew size issue was a major dispute. This was plainly right, and neither party challenges it.

The Supreme Court has authoritatively explained the procedures applicable to major disputes:

The Act provides a detailed framework to facilitate the voluntary settlement of major disputes. A party desiring to effect a change of rates of pay, rules, or working conditions must give advance written notice. § 6. The parties must confer, § 2 Second, and if conference fails to resolve the dispute, either or both may invoke the services of the National Mediation Board, which may also proffer its services *sua sponte* if it finds a labor emergency to exist. § 5 First. If mediation fails, the Board must endeavor to induce the parties to submit the controversy to binding arbitration, which can take place, however, only if both consent. §§ 5 First, 7. If arbitration is rejected and the dispute threatens "substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the Mediation Board shall notify the President," who may create an emergency board to investigate and report on the dispute. § 10. While the dispute is working its way through these stages, neither party may unilaterally alter the status quo. §§ 2 Seventh, 5 First, 6, 10. *Jacksonville Terminal,* 394 U.S. at 378, 89 S.Ct. at 1115. The parties in this case did not agree to binding arbitration, and there is no contention that this dispute threatens a substantial interruption of interstate commerce.

Here, the district court held that the parties exhausted the Act's procedures, and this holding is not challenged on appeal. However, the Transportation Union contends that the Railroad and Steelworkers Local 3176 actually reached an agreement on crew size after mediation efforts ended when they executed the Supplemental Settlement Agreement, which extended crew size negotiations for ninety days, extended the pension sweetheart option for the same period and permitted contracting out if agreement on crew size was not reached. According to the Transportation Union, the Railroad was not free to abrogate this Supplemental Settlement Agreement without again going through the statutory negotiation and mediation process. The Transportation Union construes the Supplemental Settlement Agreement as either incorporating by implication past practice under old Local Rule Five or, alternately, as incorporating the rule itself. If it were correct in either contention, the Railroad would indeed be required to initiate the RLA mediation procedures anew, and the Act's status quo provision would prohibit it from unilaterally reducing crew size. On the other hand, the Railroad contends that the Supplemental Settlement Agreement did not itself either continue the old local rule or imply any agreement that the practice the rule evidenced would be continued. Accordingly, the Railroad says it was entitled to engage in self-help.

As summarized in Part I of this opinion, the Transportation Union, on appeal, relies on two arguments in contending that the Supplemental Settlement Agreement continues old Local Rule Five. First, in its implied agreement argument, the Transpor-

with a new § 6 notice, pursuant to 45 U.S.C.A. § 156.

tation Union argues that the Supplemental Settlement Agreement is a complete agreement providing by implication that the parties' failure to agree on crew size limited the changes the Railroad could make to the two specific items the Supplemental Settlement Agreement expressly set out. Therefore, the Transportation Union says if agreement on crew size was not reached, the Railroad could only (1) unilaterally refuse to implement the pension improvements and (2) withdraw the job protection the "no contracting out" provision provided. The specification of these two matters is said to imply prohibition of any other unilateral changes, including a unilateral change in crew size.

The district court rejected this contention, reasoning that the Transportation Union's position made no practical sense and could only disadvantage its members. So construed, the Supplemental Settlement Agreement permitted the Railroad to deny not only the operating workers the pension improvements, but also to contract out the workers' jobs if there was no agreement on crew size within the ninety days provided for further negotiations. As the district court reasoned, under this approach the only way the Railroad could have accomplished the desired reduction in crew size would have been to contract out to non-union employees for all three crew positions. This would have resulted in the loss of three union jobs per crew instead of the one that would have been lost if the Transportation Union had surrendered unconditionally and agreed to let the Railroad reduce the crew size from three to two without further ado. However, at oral argument, the Transportation Union stated its members were willing to risk this outcome because they believed that Bethlehem Steel could not perform the required work without crews taken from the local union's membership. We believe the Transportation Union and the workers would be enti-

tled to take that gamble if the Supplemental Settlement Agreement could be construed to carry forward the former practice on crew size.

■ However, nothing in the four corners of the Supplemental Settlement Agreement supports the Transportation Union's argument that in the absence of agreement on the crew size issue, the Railroad could make no changes beyond the two specific provisions of the Supplemental Settlement Agreement. In the absence of language even hinting at such a limitation, it seems from the face of the document, interpreted in light of the dispute's entire background, that the Railroad meant to retain its option to make the crew size change. The Transportation Union did not provide evidence that would create a genuine factual dispute as to whether the parties intended the agreement to carry forward the former practice on crew size. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11. Therefore, the district court did not err in holding that the Supplemental Settlement Agreement did not provide that the Railroad could only make the two changes specified in the agreement, but not change the crew size itself absent agreement on that issue.

The absence of any agreement to continue the practice on crew size under old Local Rule Five gains support from the affidavit of the Railroad's chief negotiator in the negotiations with the Steelworkers and Steelworkers Local 3176. In it, he states that "[t]he parties never reached an agreement ... that C & BL Local Rule Five would simply remain in effect if no agreement could be reached on crew size." *See* Affidavit of Joseph M. O'Malley, ¶ 5, J.A. at 260. Thus, considering the extrinsic evidence, we do not believe the district court could have interpreted the agreement to include a continuation of Local Rule Five.[5] In the face of the parties' express

---

**5.** The Railroad submits the affidavits of its negotiator and the Steelworkers' negotiator in support of the Railroad's position that it never gave up its ultimate right to self-help. J.A. at 259–66. However, the Transportation Union has submitted an affidavit from an individual who as-

sisted the Steelworkers in the negotiations leading to the Supplemental Settlement Agreement stating that "nothing in the text of [the Supplemental Settlement Agreement] or otherwise authorized [the Railroad] to unilaterally change crew size." J.A. at 161. These latter affidavits

statement reserving and leaving open for further negotiation the key issue of crew size, we reject that course.

 The Transportation Union also argues that the Railroad and the Steelworkers agreed to include the text of old Local Rule Five on crew size when they entered into the new master agreement. According to the Transportation Union, Rule Twenty–Four of the new master agreement, *see* J.A. at 194, making local agreements part of the master agreement, carried forward old Local Rule Five requiring a three person crew at the Railroad.

The district court opinion did not address this argument, and we are uncertain as to whether it was raised there. In any event, we hold it lacks merit. In June, 1986, the Railroad served notice on Steelworkers Local 3176 pursuant to § 6 of the RLA, 45 U.S.C.A. § 156. In the § 6 notice, the Railroad proposed changing Local Rule Five dealing with the size of operating crews. The Railroad's § 6 proposal would have given it the right to set the crew size. Thereafter, the parties exhausted the required RLA procedures. The record contains no evidence that the parties intended Rule Twenty–Four of the new master agreement to continue old Local Rule Five at this Railroad.

The Supplemental Settlement Agreement provided only for further negotiation on the subject of crew size, not continuation of either a former practice or old Local Rule Five. The parties have stipulated that no agreements were reached in the Supplemental Settlement Agreement other than the two items it expressly provided for. J.A. at 254. We hold, as a matter of law, that neither the new master agreement nor the Supplemental Settlement Agreement included or otherwise carried forward either the text of old Local Rule Five or the practice under it.

address the issue of whether the Supplemental Settlement Agreement revived the old status quo by waiving the Railroad's right to self-help; an issue the district court resolved against the Transportation Union and one not raised on appeal. However, the latter affidavits are not material to the related issue of whether, in the

## V.

 Because the parties exhausted the RLA procedures without coming to an agreement, the Railroad was immediately free to implement unilaterally its proposed changes to Local Rule Five. *See Jacksonville Terminal*, 394 U.S. at 378–79, 89 S.Ct. at 1115–16; *Florida East Coast*, 384 U.S. at 244, 86 S.Ct. at 1423. Thereafter, because neither the Supplemental Settlement Agreement nor the new master agreement by text or implication evidenced any meeting of the minds on the crew size issue, the Railroad's right to resort to self help continued, and it acted lawfully when it unilaterally implemented the change in crew size.

We will therefore affirm the district court's order granting the Railroad's motion for summary judgment.

absence of an agreement on crew size, the Railroad could take action beyond the two conditions provided for in the Supplemental Settlement Agreement. Therefore, they do not create a genuine material issue of fact that would preclude summary judgment.