

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-5-1994

# Mcquestion v. NJ Transit Auth.

Precedential or Non-Precedential:

Docket 93-5515

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

## Recommended Citation

"Mcquestion v. NJ Transit Auth." (1994). *1994 Decisions.* Paper 71.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/71

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
—————————

No. 93-5515
—————————


RICHARD M. McQUESTION,
                              Appellant
              v.

NEW JERSEY TRANSIT RAIL OPERATIONS, INC.,
                              Appellee
—————————

LOUIS A. HART,
                              Appellant
              v.

NEW JERSEY TRANSIT RAIL OPERATIONS, INC.,
                              Appellee
—————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. Civ. Nos. 88-04037 & 89-00660)
—————————

Submitted Pursuant To 3rd Cir. LAR 34.1(a)
January 28, 1994

Before:  MANSMANN, NYGAARD, and WEIS, Circuit Judges

Filed July 6, 1994
—————————

Thomas M. McCarthy, Esquire
90 Maple Avenue
Red Bank, New Jersey  07701

Attorney for Appellants Richard M. McQuestion and Louis A. Hart

Fred Devesa, Esquire
Acting Attorney General of New Jersey
Joseph L. Yannotti, Esquire
Assistant Attorney General
Robert A. Shire, Esquire
Deputy Attorney General
Richard J. Hughes Justice Complex
CN-112

Trenton, New Jersey  08625

<u>Attorneys for Appellee New Jersey Transit Rail Operations, Inc.</u>

———————

OPINION OF THE COURT

———————

WEIS, <u>Circuit</u> <u>Judge</u>.

In this appeal, we hold that under the Railway Labor Act, 45 U.S.C. § 151 <u>et</u> <u>seq</u>., grievances arising from the discharges of two employees should be arbitrated by the National Railroad Adjustment Board.  We conclude that despite the absence of a formally ratified collective bargaining agreement, a <u>de</u> <u>facto</u> agreement existed and that the Adjustment Board erred in declining to exercise jurisdiction over the grievances.  Accordingly, we will reverse the district court's judgment sustaining the Adjustment Board's position.

Police Officers Richard M. McQuestion and Louis A. Hart were employed by New Jersey Transit Rail Operations, Inc. until they were discharged on June 20, 1985 and August 2, 1985, respectively.  At the time of their discharges, they were members of the New Jersey Transit Policemen's Benevolent Association.  Although the Benevolent Association was actively negotiating with N.J. Transit, no collective bargaining agreement had yet been ratified by the union membership at the time when the employees were discharged.  During the pendency of negotiations, however, employee conduct and grievance procedures followed work rules derived from an earlier, non-ratified draft of an agreement.

2

After unsuccessfully pursuing in-house grievance procedures, the Benevolent Association petitioned the Adjustment Board to arbitrate the employee discharges. The Adjustment Board dismissed both claims on the ground that it lacked jurisdiction, stating: "In the absence of a ratified contractual agreement between the parties that covers Claimant's employment, the Board has no contractual basis upon which to rule."

The employees then filed petitions for review in the United States District Court for the District of New Jersey. The court dismissed the petitions on the ground that the employees lacked standing to contest the Adjustment Board's rulings on claims filed on their behalf by the union. We reversed. See McQuestion v. New Jersey Transit Rail Operations, 892 F.2d 352 (3d Cir. 1990).

On remand, the district court again denied the petitions for review. The court concluded that the Adjustment Board's jurisdiction under 45 U.S.C. § 153 First (i) is limited to "resolve only `minor' disputes which have come to be defined as those arising out of the interpretation and application of the collective bargaining agreement." Rejecting the employees' argument that the interim operating procedures implemented by N.J. Transit governed the dispute, the court decided that they were "not the same as procedures which are the ratified product of the collective bargaining process." The employees then filed a second appeal with this Court.

I.

3

We exercise plenary review over the sole issue before us -- whether the employee discharges in this case are subject to the exclusive jurisdiction of the Adjustment Board.  See Miklavic v. USAir, Inc., 21 F.3d 551, 553 (3d Cir. 1994).

One of the primary purposes of the Railway Labor Act is to avoid disruptions to commerce caused by interruptions in the operations of rail and air carriers as the result of labor unrest.  The method of resolution of disputes between a carrier and its employees depends on whether the conflicts are classified as either "major" or "minor."  "Major" disputes are those concerning the formation or modification of collective bargaining agreements.  See id.  "Minor" disputes cover those more-or-less routine employee grievances that arise daily within the railway industry.  Union Pac. R.R. v. Sheehan, 439 U.S. 89, 94 (1978) (per curiam).

There is no serious contention here that we are confronted with a "major" dispute, and the real issue is whether the discharges are "minor" for purposes of establishing the exclusive jurisdiction of the Adjustment Board.  The pertinent statutory provision, codified at 45 U.S.C. § 153 First (i), reads in pertinent part:

> "The disputes between an employee or group of
> employees and a carrier or carriers growing
> out of grievances or out of the
> interpretation or application of agreements
> concerning rates of pay, rules, or working
> conditions . . . may be referred by petition

4

of the parties or by either party to the appropriate division of the Adjustment Board . . . ."

In Elgin, Joliet & E. Ry. v. Burley, 325 U.S. 711, 723 (1945), the Supreme Court described the statutory arrangement for the Adjustment Board's role as contemplating

"the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one.  The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case.  In the latter event the claim is founded upon some incident of the employment relation, or asserted one, independent of those covered by the collective agreement, e.g., claims on account of personal injuries."[1]

Later in the opinion, the Court noted that the Adjustment Board had authority to determine what the employer and union had "agreed upon previously or, outside the scope of a collective agreement, what rights the carrier and its employees

_____

[1] The Court further pointed out that "minor" disputes are generally those over rights accrued under a collective agreement and are not aimed at creating new ones for the future.  Burley, 325 U.S. at 723.

5

may have acquired by virtue of other incidents of the employment relation."  Id. at 747-48 n.44.

In Consolidated Rail Corp. v. Railway Labor Executives' Ass'n, 491 U.S. 299 (1989), the parties had entered into a collective bargaining agreement, and the issue was whether the dispute should be classified as "major" or "minor."  After reiterating the Burley test, the Court observed that neither party relied on any express provision of the agreement.  Commenting that the parties based their arguments instead on implied contractual terms, the Court concluded that "`practice, usage and custom' is of significance in interpreting their agreement."  Id. at 311.  Accordingly, although the collective bargaining agreement was completely silent on the issue at hand, the Court held that the dispute between the union and the railroad was a "minor" one and within the exclusive jurisdiction of the Adjustment Board.  Id. at 312.

The purpose of the Railway Labor Act and the role of the Adjustment Board was set out in Sheehan, 439 U.S. at 94.  Describing the Adjustment Board as a tribunal for workers and management to secure the prompt, orderly, and final settlement of day-to-day grievances between employees and carriers regarding rates of pay, rules, and working conditions, the Court observed that "Congress considered it essential to keep these so-called `minor' disputes within the Adjustment Board and out of the courts."  Id.; see also Pennsylvania Fed'n of Bhd. of Maintenance of Way Employees v. National R.R. Passenger Corp., 989 F.2d 112,

6

114 (3d Cir. 1993); Association of Flight Attendants v. USAir, Inc., 960 F.2d 345, 347 (3d Cir. 1992).

The burden imposed upon a party asserting that a dispute is "minor" is a "light" one. Southeastern Pa. Transp. Auth. v. Brotherhood of R.R. Signalmen, 882 F.2d 778, 783 (3d Cir. 1989). Whenever there is doubt as to whether a particular dispute is a "major" or a "minor" one, courts will construe the dispute to be "minor." See, e.g., Hirras v. National R.R. Passenger Corp., 10 F.3d 1142, 1145 (5th Cir. 1994), petition for cert. filed, 62 U.S.L.W. 3693 (U.S. Apr. 7, 1994) (No. 93-1584); General Comm. of Adjustment, United Transp. Union, W. Md. Ry. v. CSX R.R., 893 F.2d 584, 591 (3d Cir. 1990); Brotherhood of Locomotive Eng'rs v. Atchison, Topeka & Santa Fe Ry., 768 F.2d 914, 920 (7th Cir. 1985).

As a general matter, disagreements about whether a discharge from employment was proper and whether the claim brought by the employee is within the ambit of the relevant agreement are matters within the jurisdiction of the Adjustment Board. See Andrews v. Louisville & Nashville R.R., 406 U.S. 320, 324 (1972); Capraro v. United Parcel Serv. Co., 993 F.2d 328, 333 (3d Cir. 1993) (wrongful discharge is a minor dispute). In United Steelworkers, Local 913 v. Union R.R., 648 F.2d 905, 911 (3d Cir. 1981), we held that "[a]n employee complaining of a wrongful discharge after an investigative hearing has been conducted must submit the claim to an adjustment board pursuant to the Railway Labor Act."

7

Most of the decisional law in this area discusses situations where a collective bargaining agreement already exists.  However, as Consolidated Rail points out, the dispute need not be governed by the specific terms of the collective bargaining agreement; implied terms, past practices, usage, and custom are sufficient bases for the resolution of a controversy by the Adjustment Board.  Consolidated Rail, 491 U.S. at 311.

Some courts have mentioned in dicta the existence of a formal collective bargaining agreement as a prerequisite to the Adjustment Board's jurisdiction.  See e.g., Consolidated Rail, 491 U.S. at 305; Miklavic, 21 F.3d at 554; Association of Flight Attendants, 960 F.2d at 349; United Transp. Union v. Conemaugh & Black Lick R.R., 894 F.2d 623, 628 (3d Cir. 1990); General Comm. of Adjustment, 893 F.2d at 589; Southeastern Pa. Transp. Auth., 882 F.2d at 783; Childs v. Pennsylvania Fed'n Bhd. of Maintenance Way Employees, 831 F.2d 429, 437 (3d Cir. 1987); International Ass'n of Machinists v. Northwest Airlines, 673 F.2d 700, 708 (3d Cir. 1982); Goclowski v. Penn Cent. Transp. Co., 571 F.2d 747, 756 (3d Cir. 1977).  The terms of an agreement are often irrelevant, however, to the actual resolution of the dispute. Courts must be wary of the curious metamorphosis that sometimes occurs in decisional law when a coincidence of fact in earlier opinions is treated as a jurisdictional element in later cases. See United States v. McElroy, 644 F.2d 274, 277 (3d Cir. 1981) (en banc), aff'd, 455 U.S. 642 (1982).  That being so, dicta about the necessity of a formal collective bargaining agreement must be read with caution.

8

The statute speaks of disputes "growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions."  45 U.S.C. § 153 First (i).  In Burley, the Court commented somewhat enigmatically about the existence of a collective bargaining agreement "already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one [presumably a new collective bargaining agreement]."  Burley, 325 U.S. at 723. What is considered an "agreement" for purposes of invoking the jurisdiction of an Adjustment Board has not received extensive analysis.

In Pittsburgh & Lake Erie R.R. v. Railway Labor Executives' Ass'n, 491 U.S. 490, 503 (1989), the issue in dispute -- the sale of railroad assets causing the loss of jobs of two-thirds of the railroad's employees -- was concededly not within the scope of the written collective bargaining agreement.  In its opinion, the Court wrote:  "Of course, not all working conditions to which parties may have agreed are to be found in written contracts.  It may be that `in the context of the relationship between the principals, taken as a whole, there is a basis for implying an understanding on the particular practice involved.'"  Id. at 503-04 (quoting Detroit & Toledo Shore Line R.R. v. United Transp. Union, 396 U.S. 142, 160 (1969) (Harlan, J., dissenting)).  It is not necessary that the relevant agreement between the parties be contained only in a formal written document that specifically addresses the issue in dispute.  See

9

Transportation-Communication Employees Union v. Union Pac. R.R., 385 U.S. 157, 161 (1966) ("In order to interpret [an agreement under the Railway Labor Act] it is necessary to consider the scope of other related collective bargaining agreements, as well as the practice, usage and custom pertaining to all such agreements."); Chicago & N.W. Transp. Co. v. Railway Labor Executives' Ass'n, 908 F.2d 144, 156 (7th Cir. 1990) (normative practices can create implied obligations in a collective bargaining agreement); Southeastern Pa. Transp. Auth., 882 F.2d at 785 (parol evidence may be used to interpret collective agreements under the Railway Labor Act); CSX Transp. v. United Transp. Union, 879 F.2d 990, 1000 (2d Cir. 1989) (An agreement is established where a carrier's past practices have been accepted by union).

In Southeastern Pa. Transp. Auth., 882 F.2d at 784 n.4, we concluded that "principles developed in construing collective bargaining agreements in the NLRA context provide relevant and useful guidance [for interpreting the Railway Labor Act]." See Mack Trucks, Inc. v. International Union, 856 F.2d 579, 592 (3d Cir. 1988) ("Adoption of an enforceable labor contract does not depend on the reduction to writing of the parties' intention to be bound."); see also Merk v. Jewel Food Stores Div. of Jewel Cos., 945 F.2d 889, 895 (7th Cir. 1991) ("[A] collective bargaining agreement may be partly or wholly oral as well as partly or wholly in writing, and a written collective bargaining agreement may be orally modified."); NLRB v. Haberman Constr. Co., 641 F.2d 351, 355-56 (5th Cir. 1981) (en banc) ("[A] union

10

and employer's adoption of a labor contract is not dependent on the reduction to writing of their intention to be bound. Instead, what is required is conduct manifesting an intention to abide by the terms of an agreement." (footnote and citations omitted).[2]

In <u>Luden's Inc. v. Local Union No. 6 of the Bakery Confectionery & Tobacco Workers Int'l Union</u>, No. 92-1982, slip op. (3d Cir. June 17, 1994), employees remained on the job while the union and management continued to negotiate after a collective bargaining agreement had lapsed. After a new contract had ostensibly been agreed upon, a dispute erupted over one provision. We held that the arbitration process in the expired collective bargaining agreement should be utilized to resolve the dispute and described the relationship between the parties as creating an "implied in fact" contract. We determined that the arbitration provision had remained in effect given the absence of any evidence that the parties intended otherwise and because they acted as if that portion of the expired agreement would continue to govern. <u>Id</u>. at 35.

By way of contrast, in <u>Davies v. American Airlines</u>, 971 F.2d 463, 468 (10th Cir. 1992), <u>Regional Airline Pilots Ass'n v. Wings W. Airlines</u>, 915 F.2d 1399, 1401 (9th Cir. 1990), and <u>Lancaster v. Norfolk & W. Ry.</u>, 773 F.2d 807, 814 (7th Cir. 1985), the Courts of Appeals took the position that a dispute that was

---

[2]Contrast the provision in the National Labor Relations Act, 29 U.S.C. § 158(d), that requires the execution of a written contract if requested by either party. Note also the requirement for a writing if a claim implicates an employer's duty to pay into union pension funds under 29 U.S.C. § 186(c)(5)(B). <u>See</u> <u>Abbate v. Browning-Ferris Indus.</u>, 767 F.2d 52, 56 (3d Cir. 1985).

11

not covered by the terms of a written collective bargaining agreement was not a "minor" one. We are not persuaded by those cases, but are instead inclined to follow those courts which have adopted a flexible stance on the jurisdiction of the Adjustment Board. For example, in Railway Labor Executives Ass'n v. Atchison, Topeka & Santa Fe Ry., 430 F.2d 994, 996 (9th Cir. 1970), the Court found that a pay dispute not within the terms of the collective bargaining agreement, but "founded upon some incident of the employment relationship" was within the jurisdiction of the Adjustment Board.

Similarly, in Missouri-Kansas-Texas R.R. v. Brotherhood of R.R. Trainmen, 342 F.2d 298, 300 (5th Cir. 1965) (Maris, J., sitting by designation), the Court concluded that grievances over unsafe and hazardous working conditions were arbitrable disputes within the jurisdiction of the Adjustment Board even where no express provision in the collective agreement governed that issue. In the same vein, Hirras, 10 F.3d at 1149 stated: "[S]tate law claims that `grow out of the employment relationship can constitute "minor disputes" under the [Railway Labor Act], even when the claims do not arise directly from the collective bargaining agreement itself.'" (quoting Morales v. Southern Pac. Transp. Co., 894 F.2d 743, 745 (5th Cir. 1990)).

The airline industry is also subject to the Railway Labor Act, but its contracts are more often subject to definite term limits than those of rail carriers. Consequently, disputes occurring at a time when a collective bargaining agreement is not

12

in effect are more numerous in that industry and have come to the attention of appellate courts.

In International Ass'n of Machinists v. Aloha Airlines, 776 F.2d 812 (9th Cir. 1985), the parties disputed the wages payable after a collective bargaining agreement had expired and during the period of negotiations for a new agreement. The Court observed that the dispute was not subject to arbitration because "there was simply no existing collective bargaining agreement to interpret." Id. at 816.

The Court of Appeals for the D.C. Circuit rejected this approach in Air Line Pilots Ass'n, Int'l v. Eastern Air Lines, 863 F.2d 891, 898 (D.C. Cir. 1988), concluding that the assertion that a dispute automatically becomes a "major" one when the agreement expires "appears to disregard the existence of disputes that are altogether outside the contractual relation of the parties and to slight the long line of precedents . . . that emphasize settled past practice in classifying disputes as major or minor." The Court commented that the nature of a dispute is not determined solely from explicit terms of a written agreement, but it may also be derived from the past course of dealings between the parties. Id. at 899. Disputes that were once considered "minor" before the termination of a collective bargaining agreement do not change their characteristics thereafter. The Court in Eastern Air Lines quoted with approval from Brotherhood of Maintenance of Way Employees, Lodge 16 v. Burlington N. R.R., 802 F.2d 1016, 1022 (8th Cir. 1986), acknowledging that "`[w]hen long-standing practice ripens into an

13

established and recognized custom between the parties, it ought to be protected against sudden and unilateral change as though it were part of the collective-bargaining agreement itself.'" Eastern Air Lines, 863 F.2d at 899.

In Miklavic, 21 F.3d at 554, we were confronted by the conflict between Aloha and Eastern Air Lines and adopted the rationale of Eastern Air Lines. We pointed out that following Aloha "would mean that every dispute, no matter how firmly based in the existing but expired contract and no matter how insignificant, would become a major dispute subject to federal court jurisdiction." Id. at 554-55. We had previously cited Eastern Air Lines with approval for the proposition that to gain a comprehensive picture of the relationship between the parties, and thus of the full scope of the dispute, "`courts must consider the express terms of any agreements and well established practices that have developed through the [parties'] past course of dealings.'" General Comm. of Adjustment, 893 F.2d at 592.

From these cases we may arrive at some general conclusions about the requirement of a collective bargaining agreement as it relates to the jurisdiction of the Adjustment Board:

1. The dispute need not be governed by the written terms of an agreement, but may be resolved by resorting to employment practice or custom;

2. An agreement need not be in writing for the purpose of invoking the jurisdiction of the Adjustment Board; and

3. After the expiration of a written, ratified labor

14

contract, the parties may by their practice or custom, continue to be governed by the terms of the prior contract.

III.

With these precepts in mind, we turn our attention to the grievances at hand. A determination of the legal consequences of the parties' relationship here requires a somewhat detailed history of the events that occurred before the grievances arose.

Our recital of the facts is colored by the posture of the case before us. In effect, the district court granted summary judgment for N.J. Transit in affirming the denial of jurisdiction by the Adjustment Board. Most of the pertinent facts are not controverted, but we have considered the evidence in the record in the best light from the standpoint of the employees, McQuestion and Hart.

The saga began before January 1, 1983 when N.J. Transit took over certain commuter rail lines that had previously been operated by Consolidated Rail Corporation (Conrail). The transfer was authorized by the Rail Passenger Service Act as amended by the Northeast Rail Service Act of 1981. 45 U.S.C. §§ 586, 588. The statute required N.J. Transit and employee representatives to negotiate an implementing agreement that would govern the transfer of former Conrail employees to N.J. Transit and the retention of their seniority rights.

The statute also required N.J. Transit and employee representatives to enter into new collective bargaining agreements by September 1, 1982. Id. § 590(a). If the parties

15

were unable to reach an agreement under § 590(b)-(g), an emergency board requested by a party and created by the President of the United States could make a non-binding selection of one of the final offers, with employees retaining the right to strike. This procedure was the "exclusive means" for resolving disputes relating to the formation of an initial collective bargaining agreement. Id. § 590(h).

Pursuant to the statute, N.J. Transit negotiated with the International Brotherhood of Teamsters, at that time the bargaining representative of police officers transferring from Conrail. Although the union representatives and N.J. Transit reached an agreement, the union membership failed to ratify it.

Following the procedures of 45 U.S.C. § 590, a Presidential Commission conducted a hearing and, in late 1982, issued its non-binding recommendation that the union adopt the contract its representatives had previously negotiated with N.J. Transit. The union rejected the recommendation and was then at liberty to strike if it so chose. The members, however, continued to work after January 1, 1983 without ratifying the proposed agreement even though the previous contract between Conrail and the union had expired on December 31, 1982.

In August of 1983, the Benevolent Association replaced the Teamsters as the bargaining representative for the police officers employed by N.J. Transit. In the fall of 1983, the

16

union sent an untimely request to the National Mediation Board in an attempt to bring an end to the impasse.[3]

According to the union, when negotiations broke off, N.J. Transit -- using self-help -- implemented the unratified agreement as the operating guide for regulating the employment of the police officers. Correspondence from N.J. Transit supports this assertion.[4]

Article 16 of the unratified January 1, 1983 agreement provided that police officers who had been in service for more than one year would not be suspended or dismissed "without just cause and without a fair and impartial trial." Provisions for in-house trials and appeals were included as well.

This was the state of the relationship between N.J. Transit and its police officers in 1985. On June 20, 1985, McQuestion was dismissed because of an incident in which, while on his way to work, he fired his pistol and wounded a motorist. Hart was dismissed on August 2, 1985 because of evidence that he had been arrested and charged with possession of cocaine. Both

---

[3]The facts in the two foregoing paragraphs were set out in an affidavit filed by Patrick J. O'Brien, past President of the Benevolent Association.

[4]In other litigation, in a similar factual setting, N.J. Transit argued that there had been contract ratification through performance, rather than that N.J. Transit had lawfully and unilaterally implemented the unratified contract. See Dunn v. New Jersey Transit Corp., 681 F. Supp. 246 (D.N.J. 1987). Specifically, N.J. Transit argued that both it and the Benevolent Association had "followed procedures for resolution of grievances and appeals of disciplinary procedures which were contained in the unratified agreement, including the clause which provides that no employee dismissal shall occur `without just cause and without a fair and impartial hearing.'" Id. at 249 (internal quotation omitted).

McQuestion and Hart were given in-house trials and took appeals to management officials in N.J. Transit as mandated by Article 16 of the agreement. It was only after failing to prevail in these efforts that the union filed petitions with the Adjustment Board.

In its submissions to the Adjustment Board, the union stated that the "unratified collective bargaining agreement . . . [was] independently under dispute before another authority,"[5] but explained that the union was "forced to submit [the] submission to [the Adjustment] Board pursuant to said agreement." However, the legal arguments that followed were based upon language in "the applicable agreement," and the practice of the union and N.J. Transit in discharge cases indicated acquiescence with "the agreement."

The disputes between the two officers and their employer are classic examples of "minor" disputes that, had the agreement of January 1, 1983 been ratified, unquestionably would have been adjudicated by the Adjustment Board. Indeed, these are precisely the kinds of disputes that the Supreme Court made clear were to be kept out of the federal courts and to be resolved in arbitration.

---

[5]On May 3, 1985, the union filed a petition with the New Jersey Public Employment Relations Commission, asserting that the state board had authority to resolve the impasse between N.J. Transit and the union over the formation of a formal collective bargaining agreement. In 1986, the agency held that the state statute was preempted by the Rail Passenger Service Act and, alternatively, by the Railway Labor Act. New Jersey Transit Corp., 12 NJPER ¶ 17280 (1986). The union explained that it did not wish to be prejudiced in that state case by asserting before the Adjustment Board that it had agreed with the implementation of the 1983 unratified contract.

Based on the less than complete record here, it is apparent that although the January 1, 1983 agreement was not ratified by the union, N.J. Transit and the union put its grievance provisions into effect. These provisions formed the basis for the employment relationship between the union and N.J. Transit in the more than two-year interim before the McQuestion and Hart claims arose.

Neither the union nor N.J. Transit have ever questioned that an agreement existed to the effect that an officer could not be dismissed except for "just cause" and only after "a fair and impartial trial" -- the essential issues in the grievances presently before us. In addition, both the union and N.J. Transit scrupulously followed the procedures set out in the January 1, 1983 agreement in processing the two claims.

Nothing in the record indicates that the "just cause" and grievance procedures in Article 16 differed from those in the contract that had expired on December 31, 1982. In fact, in his affidavit, former union President O'Brien averred: "The discipline/appeals provisions essentially mirrored those in the [predecessor] Conrail-Teamsters' contract. They are pretty much industry standard."

In the absence of an agreement, N.J. Transit would have had the power to discharge the officers without cause. See Conrad v. Delta Air Lines, 494 F.2d 914, 916 (7th Cir. 1974). However, the employer's compliance with the grievance procedures in Article 16 is strong evidence that N.J. Transit recognized its obligation to dismiss employees only for "just cause."

19

N.J. Transit's joinder with the union in agreeing in its original submission that the Adjustment Board had jurisdiction is also significant. Although the union and N.J. Transit could not confer jurisdiction on the Adjustment Board by consent,[6] their mutual view that it existed is further evidence that an enforceable employment relationship was in effect -- at least as to discharges for cause only.

In short, in the scenario we have discussed, there was a de facto ("implied in fact") agreement on certain aspects of the employment relationship between the union and N.J. Transit. The fact that these particular matters were not incorporated into a formal, ratified contract that included many other terms not relevant to the dispute at hand does not deprive the Adjustment Board of jurisdiction. As noted earlier, the prerequisite "agreement" is not limited to specific terms of a formal collective bargaining agreement, but may instead include evidence of past practices and custom such as those which seemingly exist here.

Moreover, if it develops that the discipline and "just cause" provisions in the contract that expired on December 31, 1982 are essentially the same as those in the agreement the union and N.J. Transit implemented in the grievance procedures involving McQuestion and Hart, this case would fall within the holding of Eastern Air Lines that we approved in Miklavic. Thus,

_____

[6] The union argues that, in an earlier proceeding, the Adjustment Board found that it did have jurisdiction in a similar case. Dunn v. New Jersey Transit Rail Operations, Inc., Award No. 4365 (N.R.A.B., Fourth Div. Oct. 24, 1985).

if the performance of the union and N.J. Transit establishes that the "just cause" and grievance provisions of the expired Conrail agreement remained in effect during the pendency of negotiations for a new collective bargaining agreement, they would constitute the terms of the continuing employment relationship and would be binding on the parties to this dispute.

It follows that the Adjustment Board took an unduly narrow view of its jurisdiction. The Railway Labor Act does not require a ratified collective bargaining agreement, but speaks only in terms of an "agreement." Caselaw also makes it clear that provisions other than those specified in a written document may be relevant and dispositive in the resolution of a dispute before the Adjustment Board.

In our view, the record establishes an agreement between the union and N.J. Transit on the conditions under which employment could be terminated and the grievance procedures to be followed by a discharged employee. In such circumstances, the Adjustment Board would have jurisdiction to arbitrate the disputes. However, because the parties did not fully focus on this aspect of the Adjustment Board's jurisdiction, they may require a hearing and an opportunity to present further evidence to clarify the record.

Accordingly, we will reverse the judgment of the district court and will remand for further proceedings consistent with this opinion.

McQuestion v. New Jersey Transit, No. 93-5515

NYGAARD, Circuit Judge, concurring and dissenting.


The majority and I differ little in our reasoning and conclusion. But the differences, although small, are of considerable importance. I can assume without deciding that an agreement existed, but only between the two appellants and their employer, N.J. Transit. I cannot agree, however, that the facts of this case support the conclusion reached by the majority that a collective bargaining agreement had been reached between N.J. Transit and the appellants' union. I also do not agree that we can so lightly reject the Adjustment Board's definition of an "agreement." I would hold that the Adjustment Board properly concluded that without a ratified collective bargaining agreement, it had nothing to interpret and, therefore, no jurisdiction. I would conclude that if an agreement exists here, it is not a "collective" agreement, nor an agreement between N.J. Transit and the entire union, but merely an "individual" agreement, which will not independently support federal jurisdiction. Hence, I too would reverse the order of the district court, but would remand the cause for the district court to determine if there exists an independent basis for jurisdiction, and if not to dismiss.

The Adjustment Board's jurisdictional authority comes from 45 U.S.C. § 153 First (i), in which it is granted the power to hear "disputes growing out of grievances or out of the

22

interpretation or application of agreements concerning rates of pay, rules or working conditions."  In Elgin, J. & E.R. Co. v. Burley, 325 U.S. 711, 65 S. Ct. 1282 (1945), the Court said that such disputes, termed "minor," are subject to arbitration and "contemplate the existence of a collective bargaining agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one."  Id. at 723, 65 S. Ct. at 1290.

The essence of the Railway Labor Act is that it authorizes collective bargaining units to select bargaining agents and permits them to negotiate collective agreements with a carrier/employer.  Union Pac. R.R. Co. v. Sheehan, 439 U.S. 89, 94, 99 S. Ct. 399, 402 (1978) ("[T]he terms, purposes and legislative history of the Railway Labor Act ... endeavor[] to promote stability and labor management relations in this important national industry by providing effective and efficient remedies for the resolution of railroad/employee disputes arising out of the interpretation of collective bargaining agreements.") (emphasis added, internal citations omitted); Virginia Ry Co. v. System Federation No. 40, 300 U.S. 592, 515, 57 S. Ct. 592, 600 (1937) (The declared purposes of the Act give to employees "the right to organize and bargain collectively through a representative of their own choosing ....") (emphasis added). The Act uses the term "agreement," but given the purposes of the Act, it is fundamental that it means a "collective bargaining agreement," and is not meant to cover the garden variety, private agreements any employer can reach with its individual employees.

23

See <u>Griesmann v. Chemical Lehman Tank Lines, Inc.</u>, 776 F.2d 66, 71 (3d Cir. 1985) ("A collective bargaining agreement is the paradigmatic labor contract, covering a wide array of contingencies that may arise in the employment relationship, and distinguished by provisions for the arbitration of disputes concerning the agreement's meaning and application.") (internal citations omitted).

In <u>Davis v. Ohio Barge Line, Inc.</u>, 697 F.2d 549 (3d Cir. 1983), an employee contended that a settlement agreement he had reached with his employer should be enforceable under section 301 of the Labor Management Relations Act. We rejected that argument and concluded that "[a] private agreement between an employer and employee independent of a collective bargaining agreement generally does not fall within [the Labor Management Relations Act] even though the complaint alleges some nexus with the union." <u>Id.</u> at 553. We held that a federal court has jurisdiction over a collective bargaining agreement under the Labor Management Relations Act, but has "no independent basis for jurisdiction" over the settlement agreement which the employer and employee in <u>Davis</u> had reached.

Here too, there is no collective bargaining agreement. Merely because these two employees and N.J. Transit had at some point acted as though they agreed upon some portions of the rejected draft agreement, an enforceable collective bargaining agreement was not thereby created between N.J. Transit and the entire union. At most, such an agreement would not be collective

24

but individual and would be enforceable, if at all, under state law and in state courts, not under the Railway Labor Act.

N.J. Transit did impose upon its employees many of the provisions which had earlier been proposed in the written draft. But inasmuch as that draft had not been ratified, and indeed because N.J. Transit had no collective agreement with its employees, it was free to impose upon its employees any conditions it wished within the bounds of the law. N.J. Transit did behave in a civilized fashion towards these two discharged employees. It gave them all the process to which they would have been entitled under the unratified agreement. Nonetheless, to infer a federally enforceable de facto agreement between the union and N.J. Transit, simply because these parties behaved as they did, creates the possibility of much mischief and may well discourage employers from giving employees any perquisites or processes to which they are not entitled by law while contracts are pending.

The majority's conclusion that such a de facto agreement comes within the Act is unsupported by any authority. The majority modestly admits that "[m]ost decisional law in this area discusses situations where a collective bargaining agreement already exists." (Maj. typescript at 8.) It should be noted that in each Railway Labor Act case cited in the majority opinion, the parties either had a collective bargaining agreement which controlled and defined their rights, or were operating under an expired collective bargaining agreement during the "status quo" provision of the Act.

25

Under the National Labor Relations Act, a collective bargaining agreement must be in writing if requested by either party. 29 U.S.C. § 158(d). Although the record contains no specific request for a writing, the preliminary draft was reduced to writing; the written draft was submitted to the membership for ratification; and in this form, it was rejected by the membership. There is simply nothing in this record to indicate that an oral agreement was acceptable. Rather, the only supportable inference from this record is that both N.J. Transit and the union expected their collective bargaining contract to be in writing. Consequently, I cannot infer that this alleged agreement, which was neither in writing, signed by the appellants, nor ratified by their union, can confer jurisdiction on the Adjustment Board.

In sum, I agree that if there were a valid ratified written collective bargaining agreement, this would be a "minor" and hence an arbitrable dispute. I also agree that if the appellants' union and N.J. Transit were parties to a collective bargaining agreement, the issues in dispute would not need to be covered by an express provision of the written contract. I do not, however, agree that an individual agreement between the parties -- whether a "de facto agreement," an agreement by implication, or an agreement created in any fashion other than as contemplated by the Act -- either creates a collective bargaining agreement between N.J. Transit and the union, or is the type of "agreement" that will confer jurisdiction upon the federal courts or the Adjustment Board. Therefore, I conclude that unless

26

another, independent basis for federal jurisdiction exists, this case must be dismissed.